**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**JOSEPH R. ERNST,**

        **Plaintiff**

                                **CIVIL ACTION NO. 3:11-cv-625**

**v.**

**EXPERIAN INFORMATION SOLUTIONS, INC.**
**TRANS UNION, LLC., WACHOVIA MORTGAGE,**
**a division of WELLS FARGO BANK, N.A.**

        **Defendants.**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW the Plaintiff, by counsel, and for his Memorandum in Support of his Motion for Partial Summary Judgment, he states as follows:

## INTRODUCTION

In July 2007, the Plaintiff's identity was used by his estranged father to obtain a Wachovia mortgage in New Jersey – without any actual employment, identity or document verification before, during or after closing. The father was prosecuted for tax fraud for his involvement in this identity theft (as well as that of the Plaintiff's brother and others). He pled guilty and in December 2011, United States District Judge Hilton sentenced him to 4 years in prison.

Wachovia knows all of this. It has seen all of the relevant documents - as has the Plaintiff, his counsel and disclosed handwriting expert, the United States Attorney, the title company against whom Wachovia asserted a claim, and now the Court. And Wachovia knew this long ago. The loan itself had to have been naturally suspicious, with

missing documents, execution by a Power of Attorney that included an obvious forgery and then scores if not hundreds of communications from the Plaintiff beginning in 2008 (when he learned of the fraud).  And yet, Defendant has refused to admit the inaccuracy of its credit reporting in which it did, even through the present, represent to the credit bureaus that it had "verified" that the Plaintiff applied for, opened and signed its loan, was past due, in default, indebted for over half a million dollars and then subjected to an involuntary foreclosure.  Wachovia has not admitted that its reporting was inaccurate because doing so would end its only technical liability defense remaining in the case.

That is because Wachovia's other possible defense – that it actually complied with the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s-2(b) and attempted a "reasonable investigation"[1] – is impossible.  Like the Defendant in *Johnson*, all that Wachovia does when a consumer makes a FCRA dispute is "(1) confirm[] that the name and address listed on the ACDVs were the same as the name and address contained in the [Defendant's computer system], and (2) not[e] that the [computer system] contained a code indicating that [the consumer] was the sole responsible party on the account." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004) ("The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications.").

---

[1] *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004) ("The key term at issue here, 'investigation,' is defined as '[a] detailed inquiry or systematic examination.' *Am. Heritage Dictionary* 920 (4th ed.2000); *see Webster's Third New Int'l Dictionary* 1189 (1981) (defining 'investigation' as 'a searching inquiry'). Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors.")

As Judge Dohnal did in *Alabran v. Capital One Bank*, No. 3:04CV935, 2005 WL 3338663 (E.D.Va. Dec. 18, 2005), and other federal courts have done when confronted with such a failure to substantively investigate a FCRA dispute, the Court must enter summary judgment.  If it does not, the Defendant's continued unwillingness to open its eyes and accept its exposure will continue to prevent a mediated alternative to trial.

**LOCAL RULE 56 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56(B), the Plaintiff states that the following material facts are undisputed:

1.    Mr. Ernst is thirty-five years old and married on September 29, 2007.  He lives in Arlington, Virginia, having obtained his Bachelor's degree in political science from American University in 2001. He has never been charged with or even accused of committing fraud or another crime, and of course has no criminal record. *Declaration of Joseph Ernst* ("Ernst Decl."), Exhibit "A", ¶¶ 2-5.

2.    In October 2008, Mr. Ernst for the first time learned that his estranged father, Thomas Ernst, had obtained a World Savings[2] mortgage (hereinafter will be referred to as "Wachovia mortgage") using his identity. *Ernst Decl.*, Exhibit "A", ¶ 6. Joseph Ernst learned about the Wachovia/Thomas Ernst mortgage when United States Internal Revenue Service ("IRS") agents came to his door as part of their investigation of Thomas Ernst. Thomas Ernst apparently attended the loan closing and signed the closing

---

[2] Wachovia and World Savings were combined by merger.  *See* https://www.wachovia.com/worldsavings last visited January 17, 2012.

documents on Mr. Ernst's behalf, relying on a fraudulent power of attorney[3]. *Ernst Decl.*,

Exhibit "A", ¶ 10.

3.      Mr. Ernst was not present at the closing, never applied for the Wachovia

mortgage, and did not authorize Thomas Ernst to act on his behalf. *Ernst Decl.*, Exhibit

"A", ¶¶ 7-9, 11-15.

4.      After the loan closing, Wachovia immediately began reporting a

$656,250.00 mortgage loan within Mr. Ernst's credit report(s). *Credit Report Tradeline*

*Produced in Rule 26(a)(1) Disclosures of TransUnion, LLC*, Exhibit "B". ("Wachovia

Mortgage", "Date Opened 7/2007", "High Balance $656,250"); *Credit Report Tradeline*

*Produced in Rule 26(a)(1) Disclosures of Experian Information Solutions, Inc.,* Exhibit

"C". ("Wachovia Mortgage", "Reported Since July 2007", "Original balance $656,250").

5.      Thomas Ernst was indicted on March 10, 2011.  *Federal Indictment of*

*Thomas Ernst*, ("Indictment"), Exhibit "D".  The indictment expressly included the

fraudulent mortgage that became tied to Joseph Ernst as a component of Thomas Ernst's

alleged criminal conduct:

- "[p]urchasing or leasing assets…in the names of his children B.E. and J.E…."
  ¶9(e);
- "[c]reating fictitious documents, including powers of attorney,… used to
  purchase assets and refinance a mortgage in the names of his children B.E.
  and J.E…."¶9(f);
-  "[c]oncealing his income and ownership of assets by purchasing or leasing
  assets… in the names of his children B.E. and J.E…."¶10(e); and
- "[c]oncealing his income and assets by creating fictitious documents,
  including powers of attorney,… used to purchase assets and refinance a
  mortgage in the names of his children B.E. and J.E…."¶10(f).

---

[3] On January 6, 2012, pursuant to F.R.C. P. 26, Mr. Ernst, through counsel, filed the
expert report of Robert Lesnevich, a forensic document examiner. In the report, Mr.
Lesnevich opines that Mr. Ernst did not sign the power of attorney. Mr. Lesnevich also
opines that it is likely that Mr. Ernst's signature was forged by Thomas Ernst.

6.      On July 26, 2011, Thomas Ernst pled guilty to Obstructing the Due

Administration of the Internal Revenue Service and Tax Evasion. A Statement of Facts

was filed as part of the plea agreement.   *Thomas Ernst Plea Agreement* ("Plea

Agreement"), Exhibit "E".  It stated:

> "The United States and the defendant THOMAS J. ERNST, agree that had this matter proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt…[Thomas Ernst] did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws by committing acts and causing omissions including and not limited to…purchasing and leasing assets in the names of his family members, including his sons J.E. and B.E., and creating fictitious legal documents in the names of family members, including his sons J.E. and B.E." ¶4(B)

7.      Thomas Ernst was sentenced on December 16, 2011. The pre-sentence

report was filed on December 9, 2011.  *Thomas Ernst PreSentence Report*, ("Presentence

Report"), Exhibit "F".  It again states that Thomas Ernst:

- "…purchased assets in the name of family members.." p. 8;
- "…engage[d] in fraudulent and deceptive practices that affect governmental entities like the IRS and U.S. Treasury, businesses and organizations  like the NLP, and even his own family members." p. 9;
- "Defendant created fictitious legal documents in the names of family members, to include his two sons. While [Thomas Ernst] did this to obstruct the IRS, he has a history of this behavior, ***even taking out mortgages in the names of his sons without their knowledge or consent.*** (emphasis added)" p. 11.

8.      Joseph Ernst did not then and does not now have personal knowledge

regarding the opening of the Wachovia mortgage loan or the mechanics as to how it was

opened.  Most of the information he now knows about this loan was obtained from his

own contacts with Wachovia, from the Wachovia documents provided in this case or

through the federal prosecution of his father.  *Ernst Decl.*, Exhibit "A", ¶¶ 12, 13, 15.

9.      The Wachovia documents produced in this case by the Defendant reveal

that the loan application and closing process should have put a reasonable lender on

notice of the fraud.  The loan could not have occurred without Wachovia's blind eye. The documents or lack thereof indicate the following:

        a.      The original Uniform Residential Loan Application was faxed to the mortgage broker without any personal contact with Joseph Ernst.  *Initial Loan Application*, Exhibit "G", WF Bates Nos. 00346-00349;

        b.      The Final Uniform Residential Loan Application obtained and accepted by Wachovia was not even signed.  *Original Loan Application*, Exhibit "H", WF Bates Nos. 00337-00340;

        c.      There was never any no personal communication or even telephone conversation with any employee of Wachovia or its broker and Joseph Ernst. *Ernst Decl.*, Exhibit "A", ¶ 13;

        d.      None of the loan documents produced by Defendant in this case evidence that anyone from Wachovia itself actually spoke to or met even with Thomas Ernst, let alone the Plaintiff.  Wachovia documents *in passim*;

        e.      The Advantage Credit report dated May 30, 2007 has an "Address Alert: Mismatch, input data does not match file (current address)," because Thomas Ernst used *his* home address to initially apply for the mortgage in Mr. Ernst's name. *Advantage Credit Report,* Exhibit "I", WF Bates Nos. 00560-00562;

        f.      The loan documents produced by Defendant in this case evidence that the Wachovia loan was closed based on papers executed almost entirely by a purported Power of Attorney. *Power of Attorney*, Exhibit "J";

g.    The fraudulent power of attorney was not recorded, not executed at the time of the loan documents and was notarized at a "Pack Ship 'n More"[4] in New Jersey unknown to the closing agent.  *Id.*;

h.    Multiple "required" documents were transmitted by Wachovia to the broker as required for the loan to close and be funded, and necessarily to be executed by Mr. Ernst himself in person, but were never returned to Wachovia, including "proof of valid photo ID".  *Closing Outstanding Issues,* WF Bates Nos. 01060-01062, Exhibit "K";

i.    Wachovia's underwriting notes show that there was no attempt by Wachovia to contact the Plaintiff or to verify his employment.  WF Bates Nos. 00513-00514, 00793-796, Exhibit "L";

f.    Wachovia's underwriting documents disclosed by Defendant also show that Wachovia approved the loan without any employment verification because Thomas Ernst provided a Holding Company of America Industrial Revenue Bond payable to Medicure Plus, Inc. ("Bond") in the amount of $5,000,000.00.

j.    Attached to this Bond was an Affidavit of Assignment that assigned the entire Bond to Mr. Ernst. The Affidavit of Assignment purports to be signed by Dorothy Valgenti as Vice President of Medicure. Medicure Bond Assignment, Exhibit "M", WF Bates Nos. 00310-314.  The document is an obvious forgery – you can see this on its face.  And remarkably, Wachovia simply accepted the document on its face as

---

[4] The Parties have also now deposed this "notary".  It is doubtful that Defendant will attempt to rely on it.  If it does so attempt, Plaintiff will then introduce the full deposition transcript (still on order) evidencing that the notary could not identify the Plaintiff, made contradictory testimony about his recollection and claimed to have seen a Virginia Drivers License with a social security number when at that time the Plaintiff had never obtained a driver's license and at a time that the Virginia DMV was no longer using the social security number on its licenses.

somehow authentic. Even more remarkable is that immediately following the Affidavit of Assignment of the Bond to Mr. Ernst, there is another nearly identical Affidavit of Assignment *that assigns the same Bond* to Benjamin Ernst. No further explanation or corroboration was requested or obtained to support the Thomas Ernst assertion that the piece of paper proved Mr. Ernst had $ 5 million.

10.     In addition, during the application and closing process, Wachovia received at least *seven* forgeries of Joseph Ernst's signature and nearly every one looked noticeably different than the last.   None of the origination documentation or any signatures from the person claiming to be Mr. Ernst match one another:

a.     *Original Loan Application*, Exhibit "H", WF Bates Nos. 00337-00340;

b.     *Power of Attorney*, Exhibit "J";

c.     *BiWeekly Electronic Funds Transfer Authorization* from June 2007, Exhibit "N", WF Bates No. 00475.  *(And the Commerce Bank account to deduct money from was not listed on the Uniform Residential Loan Application as an asset- a HUGE red flag.)*

d.     *Quitclaim Deed* dated September 12, 2007, Exhibit "O", Ernst Bates Nos.  000504-000505;

e.     *Seller's Residency Certification* dated September 10, 2007, Exhibit "P", Ernst Bates No. 000507;

f.     *Affidavit of Consideration for Use by Seller* dated September 14, 2007, Exhibit "Q", Ernst Bates No. 000508.

g.      *Mortgage* dated December 21, 2007, where Joseph Ernst's

signature is listed as a witness, Exhibit "R", Ernst Bates No. 000509-000513.

11.     Further, Wachovia's documents produced in this case reveal that during

the post-closing history of the loan, Wachovia received, apparently from Thomas Ernst,

additional correspondence in which the author forged the Joseph Ernst's signature.  These

include:

a.      Correspondence dated January 22, 2008, Exhibit "S", WF Bates

No. 00980;

b.      Correspondence received on January 30, 2008, Exhibit "T", WF

Bates No. 01154;

c.      Correspondence dated February 26, 2009, Exhibit "U", WF Bates

No. 00951;

d.      Correspondence dated July 1, 2009, Exhibit "V", WF Bates No.

00938.

12.     Wachovia's documents also show that in June 2009, its loan was 18

payments behind and entered foreclosure.  In New Jersey, a judicial foreclosure state,

Wachovia filed suit to foreclose on the property supposedly securing its fraudulent

mortgage. *Pro Se* pleadings were filed in that court case that were purportedly signed by

Joseph Ernst. Again, these documents reveal dramatically conflicting signatures for Mr.

Ernst. *Further, these documents indicate an alternate address and alternate phone*

*number for Mr. Ernst, the same address and phone number that appear on*

*correspondences from Thomas Ernst.* , Exhibit "W", WF Bates Nos. 00235-00252,

000262-000264.

13.     All of the known forgeries from each of the above documents are collected on a single page as Exhibit "X".

14.     Mr. Ernst did not sign these documents and did not even know of their existence until these were produced to his attorneys in this Eastern District of Virginia action.  *Ernst Decl.*, Exhibit "A", ¶¶ 14-16; *Fed. R. Civ. P. 26(a)(2) Expert Witness Report of Robert Lesnevich,* a forensic document examiner ("Handwriting Expert Report"), Exhibit "Y".

15.     None of the signatures applying for, agreeing to pay or otherwise acknowledging the loan belonged to Joseph Ernst.  None of the signatures on Exhibits H through W belonged to Mr. Ernst.  *Ernst Decl.*, Exhibit "A", ¶¶ 14, 16; *Handwriting Expert Report*, Exhibit "Y". In his expert report, Mr. Lesnevich opines that Mr. Ernst's did not sign the power of attorney. Mr. Lesnevich also opines that it is likely that the various Joseph Ernst signatures were forged by Thomas Ernst.  *Id*.

14.     In October 2008, after Plaintiff discovered that the mortgage had been taken out without his knowledge or consent, Plaintiff immediately notified Wachovia via phone, fax, regular mail and email. It took him over a year and a half, and transfers through two or more offices for the Plaintiff to speak with a person in a position to actually assist in his case, Kathleen Hill. Between phone calls, faxes, emails and regular mails, Plaintiff estimates that he sent well over one hundred communications to Wachovia detailing this issue.  *Ernst Decl.*, Exhibit "A", ¶¶ 18-20.

15.     The documents the Defendant and the Plaintiff have produced in this case evidence each of these disputes and communications between Mr. Ernst and Wachovia. A summary of this written correspondence is attached as Exhibit "Z."

16.     Since at least October 2008, Wachovia has reported this fraudulent mortgage within Joseph Ernst's credit reports.  It has reported the debt as having been opened by him, owed by him and defaulted by him.  Wachovia also began to report its account within the Plaintiff's credit reports with a major derogatory payment history- since January 2008. Finally, in June 2009, and thereafter, Wachovia reported to the Joseph Ernst's credit reports that he had suffered a foreclosure.  *Ernst Decl.*, Exhibit "A", ¶¶ 21-22; *Wachovia's credit reporting "ACDV" Dispute Forms* ("ACDVs"), Exhibit "AA", WF Bates No. 01074-01082 .

17.     The Wachovia credit reporting effectively removed the Plaintiff from the credit system.  In Mr. Hendrick's expert report, he opines that Mr. Ernst's damages are consistent with other victims of chronic credit report inaccuracy to include: improper denial of credit, inaccurately described as not creditworthy, chilled from applying for credit and his loss of control over his personal credit data. *Fed. R. Civ. P. 26(a)(2) Expert Witness Report of Evan Hendricks* ("*Hendricks Expert Report*"), Exhibit "BB", p. 5. Mr. Hendricks goes on to opine that the "inaccuracies caused by the Defendant severely strained his credit standing, and directly and persistently interfered with any hopes he had to resume a normal life." *Id.*, p. 6.

18.     In addition to the countless disputes and information provided directly to Wachovia, Mr. Ernst also made multiple FCRA disputes to Wachovia through the credit bureaus. These FCRA disputes are collectively labeled Exhibit "CC", Ernst Bates Nos. 000520-00545, 00561-00576:

          •     January 15, 2009 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my

knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000520.

- January 3, 2010 correspondence to Trans Union stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000561.

- January 11, 2010 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000521.

- January 14, 2010 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000522.

- January 15, 2010 correspondence to Trans Union stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000562.

- February 12, 2010 correspondence to Trans Union stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000563.

- March 15, 2010 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000523.

- April 20, 2010 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000524.

- June 16, 2010 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000525.

- July 7, 2010 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000527.

- February 9, 2011 correspondences to Experian and Trans Union stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000540, 000571.

- February 25, 2011 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my

13

knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000541.

- March 1, 2011 separate correspondences to Experian and Trans Union stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; "indictments are pending"; and the "Assistant U.S. Attorney in charge of the case is named Chuck Connolly." Exhibit "CC", Ernst Bates Nos. 000542, 000573.

- April 12, 2011 correspondence to Trans Union stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; "indictments are pending"; and the "Assistant U.S. Attorney in charge of the case is named Chuck Connolly." Exhibit "CC", Ernst Bates No. 000575.

- April 14, 2011 correspondence to Experian stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments are pending." Exhibit "CC", Ernst Bates No. 000544.

- July 7, 2011 separate correspondences to Experian and Trans Union stating that he is a "victim of a fraud scheme"; the mortgage was "obtained without my knowledge or consent"; and "indictments were recently issued and sent to you" Exhibit "CC", Ernst Bates Nos. 000545, 000576.

19.     Wachovia has acknowledged that it received at least five disputes sent through Equifax, Trans Union and Experian.  In the national credit reporting system, such disputes are communicated to a furnisher such as Wachovia as "ACDVs." *Hendricks Expert Report*, Exhibit "BB", p. 3-4.  Defendant should have either (1) compared signatures; and/or (2) examined records in its possession that supported Plaintiff's claim; or (3) reviewed the indictment of Plaintiff's father; and/or (4) interviewed Plaintiff for any additional information it thought it needed; and/or (5) all of the above." *Hendricks Expert Report*, Exhibit "DD", p. 4.

20.     The ACDVs that Wachovia admits receiving are attached as Exhibit "AA", WF Bates Nos. 01074-01082.  In the ACDVs communicated to Wachovia, the Plaintiff's disputes were fully transmitted to Wachovia:

a.     July 20, 2010- Equifax- **"Claims account take-over, fraudulent charges made on account. Verify signature, Provide or confirm complete ID."** Exhibit "AA", WF Bates No.01082.

b.     January 22, 2011- Trans Union- **"Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID."** Exhibit "AA", WF Bates No.01079.

c.     June 17, 2011- Trans Union- **"Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID.**  Additional FCRA Relevant Information states: **'victim of a fraud scheme**.' " Exhibit "AA", WF Bates No.01078.

d.     July 11, 2011- Experian- "**Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID.**  Additional FCRA Relevant

Information states: **'MY FATHER THOMAS J ERNST STOLE MY ID INFO HE HAS BEEN ARRESTED & INDICTED CASE 1:11CR-00116-CMH US DISTRICT OF VIRGINIA!!!!!!!!!!!!!!' "** (Emphasis in original) Exhibit "AA", WF Bates No.01075.

> e.     October 1, 2011- Trans Union- **Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID**.  Exhibit "AA", WF Bates No.01074.

21.     In response to each of the FCRA disputes that Wachovia admitted receiving and that are listed above, in response to Mr. Ernst's claim of a fraudulent account and/or identity theft, Wachovia responded that it had "verified" that the Plaintiff was properly identified as the person responsible for payment of its loan.  Wachovia's responses to the credit bureaus are the actual ACDVs, attached as Exhibit "DD", WF Bates Nos.01130-1137.

22.     When Wachovia received the Mr. Ernst's FCRA disputes through these ACDVs, it followed its standard dispute investigation procedures.

23.     One of the Wachovia employees who received and processed an ACDV FCRA dispute testified at his deposition:

> [W]hen we receive an – a ACDV we're basically just verifying the ID; because there's really no signature by the borrower. We can verify his name; we can verify his Social Security number; we can verify an address. That's- when we receive an ACDV that is pretty much what we can verify.

*Deposition of Juan Imperial*, Exhibit "EE," p. 12, lns. 2-13.

24.     Another of the Wachovia employees who received and processed an ACDV FCRA dispute testified at her deposition:

16

> Q.      Have you ever, in any of the credit reporting
> disputes that you've done, ACDVs disputes you've done,
> contacted the consumer who was making the dispute?
> A.      Never.

*Deposition of Kathryn S. Fuller*, Exhibit "FF", p 30, lns. 14-17.

25.     The third of the deposed Wachovia employees who received and

processed an ACDV FCRA dispute testified:

> Q.      All Right. And when you open the Fidelity screen,
> after you've confirmed in the task list that's assigned to
> you, what would you be looking to do within the CPI
> program?
> A.      I would be looking to see if the information we have
> is the same as the information that was provided on the
> ACDV.
> Q.      What categories of information are you referring to?
> A.      First, middle, last name, any type of suffix on that;
> Social Security number; and address and phone number.

*Deposition of Christopher James Caron*, Exhibit "GG," p. 48, lns. 19-25, and p. 49, lns.
1-5.

26.     Despite the numerous direct communications and the multiple FCRA

disputes, Wachovia never removed or corrected its credit reporting, even through the date

of this motion.  *Ernst Decl.*, Exhibit "A", ¶ 25.

27.     Despite the numerous direct communications and the multiple FCRA

disputes, Wachovia never reported to Equifax, Trans Union or Experian that the Mr.

Ernst disputed the Wachovia account, even through the date of this motion. *ACDVs*,

Exhibit "DD", WF Bates Nos.01130-1137.  All it would have had to do is note the

account with a code of "XB" in the "Compliance Condition Code" field of its credit

reporting.  If it had done so, the account would have been noted as disputed and would

not have impacted his credit score.  *Id.*

## STANDARD OF REVIEW

**Revised Rule 56 properly provides a mechanism for Partial Summary Judgment.**

Partial summary judgment shall be granted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). [5] Under the new Rule 56, the movant must support its factual position by citation to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A).  This represents no significant change from the standard this court has followed in resolving motions for summary judgment prior to adopting of the new rule.  *See Ratledge v. Science Appl. Int'l Corp.*, 1:10-CV-239, 2011 WL 652274 (E.D. Va. Feb. 10, 2011)(relying on established summary judgment standards where "[t]he inferences drawn from the underlying facts must be construed in the light most favorable to the nonmoving party" and "Rule 56 mandates that summary judgment be entered against a party 'who fails to make a showing sufficient to establish the existence of an

---

[5] Amendments to Fed. R. Civ. P. 56 were effective December 1, 2010.  Concerning former Rule 56(d), the comments of the Judicial Conference on the rules changes explain, among other things, that the amendments to Rule 56 are "to improve the procedures for presenting and deciding summary-judgment motions, to make the procedures more consistent across the districts, and to close the gap that has developed between the rule text and actual practice  . . .  [but] not intended to change the summary-judgment standard or burdens." One of these "salient changes" was to also "explicitly recognize that 'partial summary judgments' may be entered." *Summary Of The Report Of The Judicial Conference Committee On Rules Of Practice And Procedure*, recommended September 9, 2009, approved April 28, 2010; implemented December 2, 2010, pursuant to the Rules Enabling Act, 28 U.S.C. § 2072.

element essential to that party's case.'")(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Under the new version of Rule 56(c)(1)(B), the movant may demonstrate that there is no dispute of a material nature, including by showing that a non-movant cannot produce admissible evidence to establish or controvert a fact.  This is consistent with the established case law, for example, when the non-moving party will bear the burden of proof at trial, the moving party's burden can be met by "pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp..* 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

In this case, it is the party moving for summary judgment, the Plaintiff, who bears the burden of proof at trial.  The Plaintiff must establish there is no credible dispute as to the facts.  Here the movant has established the material facts necessary to prevail at trial through the testimony of defendants' employees, un-rebuttable witnesses and documents produced by the defendant itself.  With the existence of such evidence, the non-movant may not merely rest on conclusory allegations but must present evidence demonstrating that there is a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 140 (3d Cir. 2004); s*ee also Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 868 (E.D. Va. 2009)(explaining that "a party who raises

an affirmative defense but fails to make a sufficient showing on an element of that defense may not defeat summary judgment for the plaintiff").

For the dispute to be considered genuine, the evidence must demonstrate that a reasonable jury could return a verdict for the non-moving party. *Addison*, 2011 WL 587005, at *8. The court may not weigh the evidence or attempt to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

## ARGUMENT

### A.    Overview

Congress enacted the FCRA in 1970 as Title VI of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r ("CCPA"), its omnibus act regulating the consumer credit industry. An overarching, core CCPA theme is that prudent dissemination of accurate credit information is essential to maintain the vitality of the credit granting system in a competitive and open marketplace to insure the health of the nation's multi-trillion dollar consumer credit economy and the wellbeing of all its participants, creditors and consumers alike.[6] Congress thus made the following formal findings in adopting the FCRA:

> The banking system is dependent upon fair and accurate credit reporting.
> Inaccurate credit reports directly impair the efficiency of the banking system, and
> unfair credit reporting methods undermine the public confidence which is
> essential to the continued functioning of the banking system.

§ 1681(a)(1).

---

[6] Total outstanding consumer credit as of November 2011 was nearly $2.5 trillion. See http://www.federalreserve.gov/Releases/G19/Current, last visited January 17, 2012.

Congress enacted the FCRA with the express purpose to enable credit grantors and others to be in the best position to make reliable lending and other business decisions. § 1681(a) and (b).  Likewise, the Truth in Lending Act, Title I of the CCPA, establishes the corresponding principle that consumers are best served through their own "informed use of credit."  15 U.S.C. § 1601(a).  "Congress enacted the Truth in Lending Act in part because it believed consumers would individually benefit not only from the more informed use of credit, but also from heightened competition which would result from more knowledgeable credit shopping."  *Till v. SCS Credit Corp.*, 541 U.S. 465, 482 (2004) (quotation and footnote omitted).  The Supreme Court stated the guiding principle of this congressional philosophy nearly 40 years ago: "[B]lind economic activity is inconsistent with the efficient functioning of a free economic system such as ours."  *Mourning v. Family Publication Serv., Inc.*, 411 U.S. 356, 364 (1973).  Simply put, the viability of our credit economy depends on accurate information; Congress designed the FCRA to increase that accuracy.

In 1996 Congress amended the FCRA, Pub.L. 104-208 (Sept. 30, 1996), as explained in the Senate Report:

> Currently, the FCRA contains no requirements applying to those entities which furnish information to consumer reporting agencies.  Section 413 imposes certain obligations upon those furnishers of information to consumer reporting agencies.  The Committee believes that bringing furnishers of information under the provisions of the FCRA is an essential step in ensuring the accuracy of consumer report information.

S. Rep. 104-185, 104th Cong., 1st Sess. 49 (1995); see *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002).  Among the changes that

Congress enacted was § 1681s-2, which imposes on those furnishers[7] of information, such as Wachovia, detailed and specific responsibilities.

This Court has long ago provided one of the earliest[8] and most complete summaries of this FCRA "furnisher" section, which governs the present case, cited verbatim:

> The FCRA places various requirements on consumer credit reporting agencies, furnishers of credit information to consumer credit reporting agencies, and users of consumer credit reports. These requirements are enforced by civil liability statutes and, depending on the statutes implicated, may be enforced by either appropriate government officials or private individuals and entities. Sections 1681n and 1681o are examples of the latter. Section 1681n provides that "any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of any damages sustained by that consumer ... or not less than $1000" plus reasonable attorney's fees. 15 U.S.C.S. § 1681n. Section 1681o establishes similar liability for any person who negligently fails to comply.
> Section 1681s–2 may be functionally split into two distinct subparts. First, subsections (a), (c), and (d), delineate the following responsibilities. Subsection (a) imposes duties upon furnishers of credit information to provide consumer reporting agencies with accurate information. Subsections (c) and (d), limit the remedies available for violations of subsection (a). In particular, subsection (c) eliminates the availability of direct remedies to consumers by making Sections 1681n and 1681o inapplicable to violations of subsection (a). Subsection (d) provides that the requirements imposed by subsection (a) are only enforceable by government officials.
> **\*3** Section 1681s–2(b) of the act imposes a duty on a furnisher of information to conduct an investigation with respect to any disputes and

---

[7] A furnisher is defined as a person who "regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer." 15 U.S.C. § 1681s-2(a)(2).

[8] The Court's opinion in *Ayers* was actually decided earlier than Judge Wilkins' opinion in *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426 (4th Cir. 2004) and Judge Motz's opinion in *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142 (4th Cir. 2008), both of which accepted the same conclusions as to a § 1681s-2(b) as did the Court in *Ayers*.

report the results of that investigation to the consumer reporting agency. 15 U.S.C.S. § 1681s–2(b). Subsection (b) contains no such limitations on the availability of remedies.

*Ayers v. Equifax Info. Services*, CIV. 3:03CV551, 2003 WL 23142201 (E.D. Va. Dec. 16, 2003). As currently enacted, § 1681s-2(b) requires:

**(b) Duties of furnishers of information upon notice of dispute**

**(1) In general**

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--

**(A)** conduct an investigation with respect to the disputed information;

**(B)** review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

**(C)** report the results of the investigation to the consumer reporting agency;

**(D)** if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

**(E)** if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--

**(i)** modify that item of information;
**(ii)** delete that item of information; or
**(iii)** permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b).  Plaintiff alleges that Wachovia violated these provisions.

Fair Credit Reporting Act cases based on a furnisher defendant's failure to

investigate and correct credit reporting information nearly always require proof of the

same narrow set of liability elements:  Was an "investigation" conducted?  Was the investigation "reasonable"?  Was the disputed information inaccurate?  Did the Defendant correctly respond to the dispute after the investigation process?  *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 431-32 (4th Cir.2004).   While some issues in such a case will remain inherently jury questions, three of the four elements do not:

(1.) If the Defendant did not conduct any "investigation," the Defendant violates the statute.  *Johnson,* 357 F.3d at 431-32; *Robertson v. J.C. Penney Co., Inc.*, CIV.A. 2:06CV3KSMTP, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008) (Granting summary judgment for consumer when furnisher's investigation consisted of merely comparing the ACDV to its computer records); *See also Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1071 (9th Cir. 2008) ("A reinvestigation that overlooks documents in the court file expressly stating that *no* adverse judgment was entered falls far short of this standard. On our own motion, therefore, we grant summary judgment[.]" );

(2.) If the consumer was not obligated as Defendant reported, the information was inaccurate.  *Alabran v. Capital One Bank*, No. 3:04CV935, 2005 WL 3338663 (E.D.Va. Dec. 18, 2005); and

(3.) If the Defendant fails to provide all material information in response to the investigation/dispute, it violates the statute. 15 U.S.C. § 1681s-2(b)(1)(C).  In particular, when the Furnisher is aware that the consumer has asserted a bona fide dispute (even one with which the lender disagrees), it must report to the credit bureaus that the account was disputed.  *Saunders v. Branch Banking & Trust Co. of VA*, 526 F.3d 142, 147-49 (4th Cir. 2008); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162-63 (9th Cir. 2009).

The undisputed evidence on the record establishes that Wachovia did not investigate Mr. Ernst's dispute when it received the ACDV from the CRAs; Mr. Ernst was not obligated on the mortgage in question; and Wachovia did not provide material information concerning the disputed loan to the CRAs in response to the disputes.

Accordingly, summary judgment on these core elements with facts that cannot be disputed, and thus are established, will provide a clear, concise and efficient tableau upon which to present to a jury the material facts that remain in dispute, reduce the large range of discovery and evidence that currently confront the Parties, reduce the trial to a day and reduce the current vast gap between the Parties' understanding of the governing law sufficiently to cause each side to rationally resolve the case without further judicial burden.

**B.      Wachovia's credit reporting was Inaccurate.  Joseph Ernst was not the maker of the Wachovia mortgage note.**

Wachovia reported to the "Big Three" consumer reporting agencies - Equifax, Trans Union and Experian - that it had "verified" that the Plaintiff was the person responsible for opening and to pay the subject mortgage.  There is little doubt that Wachovia conducted a substantive investigation.  However, this will not matter if what was ultimately "blindly" verified was accurate regardless of the quality of an investigation.  Whether or not a furnisher gets the correct answer by "dumb luck" or through a lawful investigation, an accurate answer is an accurate answer.   To prevail in a § 1681s-2(b) case, the consumer needs to show (either as a liability or a damage element – courts see it both ways) that the challenged reporting was in fact inaccurate.  *Beattie v. Nations Credit Fin. Services Corp.*, 69 F. App'x 585, 591 (4th Cir. 2003) ("Also, as we

have stated previously, the information NationsCredit reported to the credit bureaus was accurate … [t]herefore, the Beatties have failed to show that the FCRA provides an actionable duty[.]").

Such a decision is one best suited for summary judgment.  In *Alabran v. Capital One Bank*, Judge Dohnal granted the consumer-plaintiff's motion for partial summary judgment in a FCRA § 1681s-2(b) case arising from a wife's unauthorized use of her husband's identity (they were estranged as of the date the case was filed).  In such a fact pattern weaker than the one now before the Court, Judge Dohnal held:

> The court concurs that there are no disputed material facts remaining after resolution of the Defendant's motion concerning whether the Plaintiff was or was not obligated on the subject indebtedness such that the resolution of the issue of the accuracy of the information is a question of law that would have to be resolved by the court anyway at some point. Accordingly, the motion will be entertained and GRANTED for the reasons already discussed.

*Alabran v. Capital One Bank* CIV.A. 3:04CV935, 2005 WL 3338663 (E.D. Va. Dec. 8, 2005).[9]

There is no question in this case that Wachovia's reporting was not accurate.  It is a simple enough question – did Joseph Ernst apply for and agree to pay Wachovia's New Jersey mortgage.  The answer is even simpler:  No, he did not.  He was not present at the closing, never applied for the Wachovia mortgage, and did not authorize Thomas Ernst to act on his behalf. *Plaintiff's Statement of Undisputed Material Facts* ("*SOF*"), ¶ 3.   The

---

[9] In contrast, In *Mullins v. Equifax Information Services, LLC*, Judge Payne granted the consumer-plaintiff's motion in limine and request for a jury instruction advising the jury that:  "*Trans Union reported that Ms. Mullins was contractually responsible for the credit card accounts in dispute here.  You are instructed that Trans Union was inaccurate in reporting that Ms. Mullins was contractually responsible for these accounts.*"  3:05CV888, Jury Instruction 16.

history of this loan would leave any impartial observer (and even a partial lender) shocked.  This is so even in the context of a 2007 financial industry where no-doc loans and easy credit (and overpaid brokers as in this case) put our entire economy under water. Even in that context this loan looks amazingly bad.  The Court can review the application, underwriting and closing documents – Plaintiff has attached nearly all that were produced by the Defendant.  The Wachovia documents produced in this case by the Defendant reveal a loan application and closing process that would have put a reasonable lender on notice of the fraud.  The loan could not have occurred without Wachovia's blind eye. *SOF*, ¶¶ 9-10.  What type of business funds and closes a $650,000 loan without any personal identification, employment verification, or even just an actual phone or in person meeting with the supposed borrower?

Plaintiff's Statement of Facts is packed with itemized indicia of fraud obvious in the loan application, the closing and the loan history.  Plaintiff does not again restate the same details.  But the simplest accuracy facts are these:  the Plaintiff has – by affidavit and deposition in this case, and cooperation with the U.S. Attorney in the criminal case – provided unqualified testimony that he never signed a mortgage note and never agreed to pay it.

Nevertheless, Wachovia has disclosed a long list of its employees, as well as the various third party actors in the loan process whose testimony is yet unknown – the now bankrupt broker; the title company to whom Wachovia has made demand for the money it has lost; the notary who allegedly would have notarized the Plaintiff's signature on a Power of Attorney used by the estranged father to transact this loan.  These have not gone anywhere and have served to strengthen the Plaintiff's case as more and more of

Wachovia's 'Hail Mary' opportunities fail.  (For example, the Notary's deposition terminated the Defendant's hope for the forged Power of Attorney).  Yet the lack of a Court ruling actually stating, "Because Plaintiff did not sign, agree to or know of the Wachovia loan, Defendant's reporting of the loan to Plaintiff's credit was inaccurate" has apparently allowed Wachovia to remain dug-in and unwilling to face its circumstances (including the full write-off of a $ 525,000 loan balance).  And so Plaintiff has disclosed and attaches hereto the handwriting report of a U.S. Government employed and trained expert who confirms that the Plaintiff did not sign the note (or other related documents) and even opines that the handwriting of known Thomas Ernst exemplars is very close to the various forgeries.

But there is further evidence of the inaccurate attribution of the loan to the Plaintiff.  The estranged father has admitted responsibility in the facts stated in his Plea Agreement.  The U.S. Attorney has confirmed the fraud in its various filings. And Judge Hilton has reached such conclusion in finding Thomas Ernst guilty and sentencing him to 4 years in federal prison.  The Federal Study Commission concluded that in those cases where the ID Theft involved the opening of new accounts or the committing of other types of fraud, of those who knew the thief's identity, 37% of victims identified a family member or relative as the perpetrator.  *Identity Theft Survey Report*, Federal Trade Commission (November 2007), p. 28.   Such cases, especially one like in this case, are always difficult on family victims.  Creditors often count on the unwillingness of the family victim to press criminal charges or expose their criminal loved one to prosecution by the lender.  But this strategy, relied on by Wachovia since 2008, was not available in this instance as the ID Thief father was prosecuted for the tax evasion result of these

criminal activities.   Thomas Ernst was indicted on March 10, 2011.  *Federal Indictment of Thomas Ernst*, ("Indictment"), Exhibit "D".  The indictment expressly included as a component of Thomas Ernst alleged criminal conduct the fraudulent mortgage that became tied to Joseph Ernst.  *SOF*, ¶ 9.  On July 26, 2011, the father pled guilty and in the agreed facts within the Plea Agreement, Thomas Ernst and the Government jointly stipulated to his "creat[tion of] fictitious legal documents in the names of family members, including his sons J.E. and B.E." and of  criminally "purchasing and leasing assets in the names of his family members, including his sons J.E. and B.E."  *Thomas Ernst Plea Agreement* ("Plea Agreement"), Exhibit "E".¶4(B).

Wachovia's credit reporting was objectively inaccurate.  It is factually impossible for Mr. Ernst to have been delinquent or in default on a loan that he never had, a fact that cannot possibly be in dispute.  Therefore, the Plaintiff is entitled to summary judgment on this important element of his claim.

**B. As a matter of law, in response to the Plaintiff's FCRA disputes, Wachovia did not conduct a lawful investigation**.

Plaintiff's primary FCRA claim under § 1681s-2(b) is for Wachovia's failure to conduct a reasonable (or any) investigation of his many disputes conveyed through the national consumer reporting agencies.  The leading case in this regard is the Fourth Circuit's *Johnson v. MBNA Am. Bank, NA*, 357 F.3d at 431-32 (affirming jury verdict before Judge Williams for a furnisher violation of § 1681s-2(b)).  Johnson and its prodigy long ago established that the § 1681s-2(b)(1)(A) directive to furnishers to "conduct an investigation with respect to the disputed information" required a "reasonable investigation," that is, a "careful" or "searching inquiry," as opposed to a "superficial"

one, "to determine whether the disputed information can be verified." *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004). The Courts of Appeals continue to unanimously follow this "reasonable investigation" standard. *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, L.L.P.*, 584 F.3d 1147, 1157 (9th Cir. 2009). *See also Robertson v. J.C. Penney Co., Inc.*, CIV.A. 2:06CV3KSMTP, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008). This standard for an investigation is a rigorous one, requiring more than a superficial data conformity check of comparing the CRA identifying information for the disputed account the furnisher's computer data (requiring more than matching social security number, date of birth and name). In a more recent decision adopting the Fourth Circuit's Johnson standard, the Court of Appeals for the Ninth Circuit explained:

> The Fourth Circuit's reasoning in *Johnson* is entirely persuasive. **By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute.** Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete *1156 credit reporting." *Nelson*, 282 F.3d at 1060. **A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.**

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155-56 (9th Cir. 2009) (emphasis added).

Generally, it has been considered to be a jury question whether the furnisher has instituted and complied with the requirement to implement and follow reasonable procedures. *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 416-17 (4th Cir. 2001)("The issue of whether the agency failed to follow 'reasonable procedures' will be a

'jury question[ ] in the overwhelming majority of cases.' *Guimond v. Trans Union Credit Info. Co,* 45 F.3d 1329, 1333 (9th Cir. 1995). *See also Andrews v. TRW Inc.,* 225 F.3d 1063, 1068 (9th Cir. 2000) ("'It would normally not be easy for a court as a matter of law to determine whether a given procedure was reasonable in reaching the very high standard set by the statute ....'"). However, when a Plaintiff carries his burden of proving that the Defendant's procedures were unreasonable because they provide no avenue to correct a known inaccurate report and no meaningful investigation, then no reasonable jury could ever find in favor of the defendant. *Johnson,* 357 F.3d at 431-32; *Saunders,* 526 F.3d at 148-49; *see also Addison* 2011 WL 587005, at *8-9 (describing the circumstances where, on summary judgment, a court may resolve factual disputes when the non-moving party's evidence simply "strains credulity"). In this case, the actual degree or quality of investigation is not an issue. Rather, Defendant did not just undertake a poor investigation, but instead it did not undertake *any* investigation. All that Defendant did was data-match, comparing the name, address and social security number in its computer screen with the same fields in the "ACDV" forms sent by the reporting agencies. Its witnesses testified that the Wachovia procedure when receiving consumer FCRA disputes under § 1681s-2(b) is to do nothing more than match summary data: "We can verify his name; we can verify his Social Security number; we can verify an address. That's- when we receive an ACDV that is pretty much what we can verify." SOL, ¶ 23. The Wachovia employee in performing what it contends is an "investigation", "would be looking to see if the information we have is the same as the information that was provided on the ACDV [-] First, middle, last name, any type of suffix on that; Social Security number; and address and phone number." *Id,* ¶ 25.

Put in clearer context – this is what Wachovia did (and still systemically does):
The consumer contends that an identity thief obtained his name, address, and social
security number and gave it to the lender to obtain a fraudulent loan.   When the
consumer disputes the account, stating that he was the victim of the theft and unlawful
use of his name, address and social, the lender "investigates" such dispute by simply
checking to see if the name, address and social in its computer assigned to the disputed
loan belongs to the protesting consumer. Of course they match.  That's the problem in the
first place.  The Fourth Circuit addressed this in 2004.  Wachovia knows that *Johnson* is
the law.  And yet it ignores its obligation to conduct a "meaningful, searching inquiry."

When a furnisher conducts only such a "data conformity" check in lieu of a §
1681s-2(b) investigation, the Defendant violates the FCRA as a matter of law.  That
element is not properly deferred for a jury.  In a federal case in the Fifth Circuit relying
heavily on *Johnson*, the District Court considered a procedure identical to that used by
Wachovia.  *Robertson v. J.C. Penney Co., Inc.*, CIV.A. 2:06CV3KSMTP, 2008 WL
623397 (S.D. Miss. Mar. 4, 2008).  The Court entered summary judgment for the
consumer-plaintiff, explaining:

> However, whether such a "reasonable" investigation has been conducted is
> generally a question of fact for the jury. See *Cousin v. Trans Union Corp.,*
> 246 F.3d 359, 368-69 (5th Cir.2001).
> **GE received the TransUnion ACDV on September 29 and returned it**
> **the same day with only a verification of identity information. There**
> **appears to have been no investigation of the disputed status of the**
> **claim at all**.
> […]
> This response, in the face of the statutory requirement to perform a
> reasonable investigation, was, at the very least, negligence on the part of
> the GE employees. **While this finding is one generally left to the**
> **province of the trier of fact, in this case the court finds that no**
> **reasonable juror could conclude otherwise but that GE's**
> **"investigation" of the dispute noted in the ACDVs from both**

**TransUnion and Equifax was not "reasonable" as a matter of law.**
Thus, there being no disputed issue of material fact in this regard, the
plaintiffs are entitled to summary judgment on the issue of negligence.

*Robertson v. J.C. Penney Co., Inc.*, CIV.A. 2:06CV3KSMTP, 2008 WL 623397 (S.D.

Miss. Mar. 4, 2008) (emphasis added).[10]

In addition to the fact that it is factually impossible for the Defendant to produce

any evidence that it engaged in a meaningful, searching investigation required under the

FCRA and *Johnson*, 357 F.3d at 431-32, at all times relevant to the accrual of this cause

of action, Wachovia was in complete and utter control of all the information necessary

for it to know that Mr. Ernst was not liable on the mortgage in question – which it had

known for several years.  Despite the fact that Wachovia knew for more than three years

that Mr. Ernst did not transact the loan, in order to establish liability under the FCRA,

Mr. Ernst had to dispute the inaccurate reporting, not to Wachovia, but to the CRAs.

This he did multiple times.  The CRAs all sent ACDVs to Wachovia.  If Wachovia had a

procedure by which it would have conducted even a minimal inquiry in response to Mr.

Ernst's first dispute, either directly to it or to the CRAs, Mr. Ernst's consumer report

would have been corrected and the derogatory information deleted as required by the

FCRA and the settled law of the Fourth Circuit.  No reasonable jury could find otherwise.

*Addison* 2011 WL 587005, at *8-9; *Bell Microproducts, Inc.*, 20 F.Supp.2d at 941.

**D. Wachovia also violated § 1681s-2(b) (1)(C) by failing to advise the CRAs
that its loan was disputed.**

_____

[10] More recent Circuit Court decisions continue to apply this teaching.  See e.g. *Dennis v.
BEH-1, L.L.C.*, 520 F.3d 1066, 1070-71 (9th Cir. 2008) (directing § 1681i(a)(1) summary
judgment against Experian for failing to sustain the consumer's dispute confirmed by
unambiguous public record documentation).

In addition, before the operative events here, federal precedent had also established that § 1681s-2(b)(1)(C)'s duty to "report the results of the investigation to the consumer reporting agency" incorporates the obligation from § 1681s-2(a) "that furnishers have a general duty to provide accurate and complete information" to the CRAs when so responding. *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 149-50 (4th Cir. 2008).   Wachovia failed to conduct even a basic substantive investigation.  But it also failed the Plaintiff, and the consumer reporting agencies, in a second way:  it failed to accurately report back to the CRAs all that it actually knew about the challenged account.  It failed to alert the CRAs that Wachovia was aware of a bone fide dispute of the account.  Had it done so, the CRAs would have deleted or suppressed the account.

This claim was the entire claim before first Judge Dohnal and the jury, and then the Fourth Circuit in *Saunders*.  The bank defendant, B.B. & T. admitted that its investigation would have revealed the presence of a consumer dispute.  (In *Saunders* the Plaintiff had several direct communications with the furnisher; in this case there were hundreds).  The jury found and Judge Dohnal sustained a violation based solely on the furnisher's failure to advise the CRAs of the disputed nature of the account.

As with *Johnson*, the Fourth Circuit's decision in *Saunders* has been adopted by multiple courts.  The Ninth Circuit did so in *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162-63 (9th Cir. 2009):

> The Fourth Circuit has recently held that after receiving notice of dispute, a furnisher's decision to continue reporting a disputed debt without any notation of the dispute presents a cognizable claim under § 1681s–2(b). *See Saunders v. Branch Banking & Trust Co. of Va.,* 526 F.3d 142, 150 (4th Cir.2008). […] This reasoning is persuasive. […]  As the Fourth Circuit observed, holding otherwise would create a rule that, as a matter of

> law, an omission of the disputed nature of a debt never renders a report incomplete or inaccurate. *See Saunders,* 526 F.3d at 150. Not only might such a rule intimidate consumers into giving up bona fide disputes by paying debts not actually due to avoid damage to their credit ratings, but it also contravenes the purpose of the FCRA, to protect against "unfair credit reporting methods." *See* 15 U.S.C. § 1681(a)(1).

*Id*.

Plaintiff now asks this Court to conclude as did the Fourth Circuit in *Saunders*. Wachovia could of - at its minimum - advised the CRAs that the Plaintiff had made a long series of direct disputes and that this account was the subject of an ongoing dispute. Had it even taken this step short of deleting the account, the Plaintiff's damages would have been much more modest. Wachovia did not investigate or delete the fraudulent tradeline and did not even note that the account was the subject of an ongoing dispute. Partial summary judgment is now appropriate. It will finally provide clarification to Wachovia, it will simplify the issues for trial and it will move this matter towards an efficient resolution.

## CONCLUSION

Accordingly, for the reasons stated fully herein, the Plaintiff asks the Court to enter Partial Summary Judgment in his favor and such other relief it finds just and appropriate.

Respectfully submitted,

**JOSEPH R. ERNST**

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail: lenbennett@cox.net

Susan Rotkis, Esq. VSB #40639
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail: srotkis@clalegal.com

Kristi Cahoon Kelly, VSB #72791
SUROVELL ISAACS PETERSEN &
LEVY, PLC
4010 University Drive, Second Floor
Fairfax, Virginia 22030
(703) 251-5400 - Telephone
(703) 591-9285 - Facsimile
E-mail:  kkelly@siplfirm.com

_Counsel for Plaintiff_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of January, 2012,  I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Hunter Wilmer Sims , Jr.
Kaufman & Canoles PC
150 W Main St
PO Box 3037
Norfolk, VA 23510
Email: hwsims@kaufcan.com

Terry Catherine Frank
Kaufman & Canoles PC (Richmond)
1021 E Cary St Suite 1400
Two James Center
PO Box 27828
Richmond, VA 23261
Email: tcfrank@kaufcan.com

*Attorneys for Wachovia Mortgage,*
*A division of Wells Fargo Bank*

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail:lenbennett@cox.net