**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**JOSEPH R. ERNST,**

        **Plaintiff,**

**v.**                                                                                            **Civil Action No. 3:11cv625**

**EXPERIAN INFORMATION SOLUTIONS,
INC., et al.,**

        **Defendants.**

**DEFENDANT WELLS FARGO BANK, N.A.'S MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW COMES defendant, Wells Fargo Bank, N.A. ("Wells Fargo")[1], and without waiving any objections raised in its Motion to Strike Plaintiff's Memorandum for failure to comply with Local Rule 7(F)(3) filed simultaneously herewith, for its Memorandum in Opposition to the Motion for Partial Summary Judgment filed by the Plaintiff, states as follows:

**I.**     **SUMMARY AND INTRODUCTION**

Contrary to the Plaintiff's contention that the facts he relies on in support of his summary judgment motion are undisputed, many of the acts important to the Plaintiff's motion are generally in dispute. In addition, a number of the Plaintiff's citation to the record do not support what the Plaintiff contends they do, or omit other portions of the record that when considered, demonstrate clearly that there are facts in dispute. Moreover, the Plaintiff continually makes comparisons to Johnson v. MBNA (357 F.3d 426 (4th Cir. 2007)),  which has little resemblance to the facts of this case. The heart of this case is whether or not Wells Fargo's investigation of

---

[1] All references in this Memorandum to World Savings Bank, Wachovia Bank, Wachovia Mortgage, Wachovia Home Mortgage, Wells Fargo Home Mortgage, or Wells Fargo Bank, N.A. shall mean "Wells Fargo."

the Plaintiff's credit dispute was reasonable under 15 U.S.C. § 1681s-2(b).   Wells Fargo contends that it was.

Notably, Plaintiff's counsel in this case was also counsel of record in <u>Johnson</u>, where he opposed a motion for summary judgment on the grounds that the question of the reasonableness of a FCRA investigation <u>was one for the jury.</u> Having decided that argument no longer suits him, Plaintiff's counsel urges the Court to grant summary judgment to the Plaintiff on the "undisputed facts" which he claims support his contention that Wells Fargo's investigation was not reasonable. On the contrary, Wells Fargo will be able to prove not only that its investigation was patently reasonable, but that the Plaintiff's own actions made it impossible for Wells Fargo to afford the relief he sought as there was nothing except Plaintiff's bald assertions that the loan did not belong to him. First, he refused to file a police report. Cognizant of the reluctance of individuals to do so in any identity theft case, Wells Fargo was willing to accept alternate means of support, as described in more detail below. The simple fact is that the Plaintiff repeatedly failed to provide Wells Fargo with his knowledge of facts that would prove crucial to Wells Fargo's investigation. Summary judgment, is therefore, not appropriate in this case and should be denied.

## II.   <u>STATEMENT OF DISPUTED FACTS</u>

Pursuant to Local Rule 56(B), Wells Fargo hereby lists the material facts as to which there is a dispute, and as to which it is contended there are genuine issues to be litigated.

A.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "2."   The Plaintiff contends that:

> In October 2008, Mr. Ernst for the first time learned that his estranged father, Thomas Ernst, had obtained a World Savings mortgage (hereinafter will be referred to as "Wachovia mortgage") using his identity. <u>Ernst Decl</u>., Exhibit "A," ¶ 6.  Joseph Ernst learned about the Wachovia/Thomas Ernst mortgage when United States Internal Revenue Service ("IRS") agents came to his door as part of their investigation of Thomas Ernst. Thomas Ernst apparently attended the loan

closing and signed the closing documents on Mr. Ernst's behalf, relying on a fraudulent power of attorney.  Ernst Decl., Exhibit "A," ¶ 10.

The Plaintiff provides inconsistent statements as to when he first learned of mortgage loan. He told Wells Fargo that he first learned of it in October 2008 when he applied for credit. **Exhibit 1,** Declaration of Kathleen C. Hill ("Hill Decl."), ¶ 5. The Plaintiff's statement to Ms. Hill is consistent, in part, with statements made at his deposition, and he testified that in October 2008, "[m]y wife and I wanted to get a home of our own … and when we applied, the gentlemen came back and said that …there was already a mortgage on my credit report." **Exhibit 2,** Deposition of Joseph R. Ernst ("J. Ernst Depo."), p 27: ¶ 19 – p. 28:¶1.

Yet the Plaintiff claims in his Declaration "that he learned about the mortgage when United States Internal Revenue Service ("IRS") agents came to his door as part of their investigation of Thomas Ernst." Ex. A to Ernst Decl., ¶10. And at his deposition, before he testified that he learned of the mortgage when he and wife applied for a home loan, he described an event that occurred in approximately January 2008. When asked how he heard of "the investigation of [his] father, his response was when "IRS agents came to my door." Ex. 2, J. Ernst Depo., p. 16: ¶¶ 12 – 23. He initially refused to talk to the IRS agent, and did not do so until he had retained an attorney and received an immunity letter. Id., p. 17:¶1 – p. 21:¶20.

Wells Fargo has reason to believe that neither of these versions of the Plaintiff's story are true, as bank account records produced by the Plaintiff reveal that he was already subscribed to a credit monitoring service when the  mortgage loan was made in July 2007. **Ex. 2,** J. Ernst Depo., p. 96:¶ 12 – p. 98:¶15; see also, **Exhibit 3,** Plaintiff's Oct. 2006 "Wachovia College Access Checking Statement," Pl. Bates No. 1132 – 1136; and **Exhibit 4,** Plaintiff's Nov. 2007 "Wachovia College Access Checking Statement," Pl. Bates No. 1216 – 1222. He would likely have received the customary "credit alerts" when his credit was accessed in attempt to apply for the Wachovia loan in June 2007. Wells Fargo will issue a subpoena to the credit monitoring

service company upon receipt of consent by the Plaintiff to review what information was provided to the Plaintiff in conjunction with this service. Perhaps not coincidentally, the mortgage was current from August 2007 until September 2008, and it was not until the loan was in danger of going into default that Plaintiff first disputed the account with Wells Fargo. **Exhibit 5,** Wells Fargo's Responses to Pl. Interrogatories, Response No. 4.

B.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "4." The Plaintiff contends that:

> After the loan closing, Wachovia immediately began reporting a $656,250.00 mortgage loan within Mr. Ernst's credit report(s). Credit Report Tradeline Produced in Rule 26(a)(1) Disclosures of TransUnion, LLC, Exhibit "B". ("Wachovia Mortgage", "Date Opened 7/2007", "High Balance $656,250"); Credit Report Tradeline Produced in Rule 26(a)(1) Disclosures of Experian Information Solutions, Inc., Exhibit "C". ("Wachovia Mortgage", "Reported Since July 2007", "Original balance $656,250").

The Plaintiff's statement regarding the loan amount is incomplete. While a high balance of $625,250.00 may have been reported, the actual loan amount of this adjustable rate mortgage was $525,000.00. **Exhibit 6,** Adjustable Rate Mortgage Note, p.1, WF00423. Wells Fargo reported the loan with a balance of $525,000.00, and the amount due changed depending on whether payments were made or interest accrued. In any event, the original balance of the loan was never $525,250.00.

C.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "5." The Plaintiff contends that:

> Thomas Ernst was indicted on March 10, 2011. Federal Indictment of Thomas Ernst, ("Indictment"), Exhibit "D". The indictment expressly included the fraudulent mortgage that became tied to Joseph Ernst as a component of Thomas Ernst's alleged criminal conduct:
> - "[p]urchasing or leasing assets…in the names of his children B.E. and J.E…." ¶9(e);
> - "[c]reating fictitious documents, including powers of attorney,… used to purchase assets and refinance a mortgage in the names of his children B.E. and J.E…." ¶9(f);

- "[c]oncealing his income and ownership of assets by purchasing or leasing assets… in the names of his children B.E. and J.E. …." 10(e); and
- "[c]oncealing his income and assets by creating fictitious documents, including powers of attorney,… used to purchase assets and refinance a mortgage in the names of his children B.E. and J.E.…."¶10(f).

While Wells Fargo does not dispute that Plaintiff accurately quotes portions of the Indictment of Thomas Ernst, further information must be considered to present a clear picture. First and foremost, the Indictment <u>does not</u> "expressly included the fraudulent mortgage that became tied to Joseph Ernst as a component of Thomas Ernst's alleged criminal conduct" as contended by the Plaintiff in "Undisputed Fact no. 5." The Plaintiff's father was indicted on six counts related to tax evasion, failure to file and obstruction.

A review of Count 1 (Obstruction) of the Indictment, which includes paragraphs 9(e) and (f) as quoted by the Plaintiff, allege matters that occur beginning on or about October 2001, and continue up to and including at least April 16, 2007. Pl. Ex. D, <u>Indictment</u>, ¶9. The mortgage loan was not applied for until June 14, 2007 (Pl. Ex. H, Uniform Residential Loan App., WF337-340), and the Note was not executed until July 5, 2007. Ex. 6, <u>Adjust. Rate Note</u>. Similarly, Count II (Tax Evasion) of the Indictment, which includes paragraphs 10(e) and (f) as quoted by the Plaintiff, allege matters that occur between 2004 and August 6, 2006. Pl. Ex. D, <u>Indictment</u>, ¶10(a)(v).

Despite the U.S. Attorney's Office's review of the mortgage documents and at least four interviews of the plaintiff by the Department of Justice, Thomas Ernst was not charged with fraud related to this loan. In addition, the Indictment does not reference a property address or confirm in any way that the Plaintiff's father was connected to a crime related to the Wachovia mortgage.

D.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "6."  The Plaintiff contends that:

> On July 26, 2011, Thomas Ernst pled guilty to Obstructing the Due Administration of the Internal Revenue Service and Tax Evasion. A Statement of Facts was filed as part of the plea agreement. Thomas Ernst Plea Agreement ("Plea Agreement"), Exhibit "E". It stated:
>
>> The United States and the defendant THOMAS J. ERNST, agree that had this matter proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt…[Thomas Ernst] did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws by committing acts and causing omissions including and not limited to…purchasing and leasing assets in the names of his family members, including his sons J.E. and B.E., and creating fictitious legal documents in the names of family members, including his sons J.E. and B.E." ¶4(B).

As a threshold matter, the document cited by the Plaintiff is not the Plea Agreement, but the Statement of Facts, which the Plaintiff quotes but fails to attach or cite as a exhibit to the his summary judgment motion.  **Exhibit 7,** Statement of Facts. Much like the Indictment, however, Wells Fargo does not dispute that the Plaintiff accurately quoted certain portions of the Statement of Facts, but notes that a more complete review of the Statement of Facts is required to demonstrate that there are disputed facts at issue here.

Thomas Ernst pleaded guilty Counts 1 (Obstruction of the Administration of Tax Laws) and 3 (Tax Evasion). The Statement of Facts address matters that occurred on about October 2001, and continue up to and including at least April 16, 2007. Statement of Facts, ¶ 4. Wells Fargo disputes the Plaintiff's assertion that Thomas Ernst admitting to "purchasing and leasing assets in the names of his family members, including his sons J.E. and B.E., and creating fictitious legal documents in the names of family members, including his sons J.E. and B.E" is conclusive of any facts related to the Wachovia mortgage. Thomas Ernst was not charged with any crime related to the Wachovia mortgage, nor is the property specifically referenced in the Indictment or Statement of Facts.

E.    Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "7." The Plaintiff contends that:

> Thomas Ernst was sentenced on December 16, 2011. The pre-sentence report was filed on December 9, 2011. <u>Thomas Ernst PreSentence Report</u>, ("Presentence Report"), Exhibit "F". It again states that Thomas Ernst:
> - "…purchased assets in the name of family members.." p. 8;
> - "…engage[d] in fraudulent and deceptive practices that affect governmental entities like the IRS and U.S. Treasury, businesses and organizations like the NLP, and even his own family members." p. 9;
> - "Defendant created fictitious legal documents in the names of family members, to include his two sons. While [Thomas Ernst] did this to obstruct the IRS, he has a history of this behavior, ***even taking out mortgages in the names of his sons without their knowledge or consent.*** (emphasis added)" p. 11.

Again, the Plaintiff fails to accurately cite to the record. Wells Fargo disputes the Plaintiff's reference to the "Thomas Ernst Pre-Sentence Report" (Ex. F to Plaintiff's Memorandum), as the document cited by the Plaintiff is actually the "Position of the United States With Respect to Sentencing.[2] While the Plaintiff does accurately regurgitate the United States' position as to sentencing, he conveniently omits that the IRS and Office of Personnel Management ("OPM") [after conducting an audit of the Plaintiff's father's company] "investigations also determined the bond offered by [Thomas Ernst] for the contract was non-existent." Ex. F to Pl. Memo., p. 3. In addition, the Plaintiff's father "did not simply create a few false documents or put assets in the name of others, actions that would by themselves justify a sophisticated means enhancement, he involved family members, sometimes [i.e. but not always] without their knowledge or consent." <u>U.S.  Position on Sentencing</u>. The Plaintiff bases his assertion that Wells Fargo's investigation of the credit dispute was unreasonable because it failed to determine that the Plaintiff was a victim of fraud, despite the Plaintiff's failure to provide his knowledge of the facts that supported his claims. Yet the Plaintiff's father was able to obtain

valuable contracts using forged documents, and avoid paying taxes for a number of years. The IRS and U.S. Attorney's Office investigated the Plaintiff's father for over four years before ultimately indicting him.

      F.    Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "8." The Plaintiff contends that:

> Joseph Ernst did not then and does not now have personal knowledge regarding the opening of the Wachovia mortgage loan or the mechanics as to how it was opened. Most of the information he now knows about this loan was obtained from his own contacts with Wachovia, from the Wachovia documents provided in this case or through the federal prosecution of his father. Ernst Decl., Exhibit "A", ¶¶ 12, 13, 15.

Contrary to the Plaintiff's contention in his Declaration (signed January 19, 2012) in support of this motion that he "did not even know of the [powers of attorney, quitclaim deed, [or] Mortgage … until they were produced to my attorneys [in this case], the Plaintiff testified just three days earlier that he saw the power of attorney ("POA") document "around the time that I was told there was a mortgage in my name and then started to do research on my own and pull documents." Ex. 2, J. Ernst Depo., p. 92: ¶4 – p. 93:¶7.  Regardless of whether the Plaintiff learned of the POA: (a) when the IRS informed him (Pl. Ex. A, Ernst Decl., ¶10), (b) or when he attempted to buy a house (Ex. 1, Hill Decl.), (c) by pulling the New Jersey records, or (d) or in 2011 when they were produced to his attorneys in this case, any combination of these scenarios are clear indicia of a genuine dispute of material fact. The Plaintiff fails to get his own story straight, and as Wells Fargo contends, at a minimum the Plaintiff was aware of the mortgage loan at the time it was disbursed.

      G.    Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "9."  The Plaintiff contends that "Wachovia documents produced in this case by the Defendant reveal that

---

[2] The actual Pre-Sentencing Report" of Thomas Ernst [Case No. 1:11CR116, Doc. No. 30] is a confidential document not available on PACER.

the loan application and closing process should have put a reasonable lender notice of the fraud. The loan could not have occurred without Wachovia's blind eye." Pl. Memo. p.7, ¶9(a)-(k). The Plaintiff then cites to the underwriting process as evidence that Wells Fargo should have been notice of fraud. Yet the Plaintiff's own actions prevented Wells Fargo from having a complete understanding of the scenario, including but not limited to: (a) his failure to file a police report; (b) withholding the fact that he resided at the property during the week between 2007 and 2009; (c) refusing to contact the notary; (d) failing to respond to Wells Fargo's inquiries for more information, (e) altering his own signature; and (f) failing to report a stolen wallet. Ex. 1, Hill Decl. **Exhibit 8** is a composite of the variety of signatures Plaintiff admits are his – it is unfathomable that Wells Fargo should be able to discern a forged signature when the Plaintiff admits to altering his own.

H.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "10." The Plaintiff contends that "in addition, during the application and closing process, Wachovia received at least *seven* forgeries of Joseph Ernst's signature and nearly every one looked noticeably different than the last. None of the origination documentation or any signatures from the person claiming to be Mr. Ernst match one another." Yet the Plaintiff admitted to altering his own signature (Ex. 2, J. Ernst. Depo., p. 9:¶1-6), a fact he acknowledged at least three (3) years prior when discussing his claims with Wells Fargo's Fraud Analyst Kathleen Hill (Ex. 1, Hill Decl. ¶ 16). Wells Fargo also refers to the Court to its **Ex. 8**

I.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "11." The Plaintiff contends that "Wachovia's documents produced in this case reveal that during the post-closing history of the loan, Wachovia received, apparently from Thomas Ernst, additional correspondence in which the author forged the Joseph Ernst's signature." Again, the Plaintiff has conceded on multiple occasions that he altered his own signatures (Ex. 2, J. Ernst. Depo., p.

9:¶1-6; Ex. 1, Hill Decl. ¶ 16). At a minimum, the Plaintiff had knowledge of the mortgage loan long before he disputed the account. <u>See</u> Bank Statements/Credit Monitoring Service, Ex. 3 and 4

J.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "12." The Plaintiff contends that "Wachovia's documents also show that in June 2009, its loan was 18 payments behind and entered foreclosure. In New Jersey, a judicial foreclosure state, Wachovia filed suit to foreclose on the property supposedly securing its fraudulent mortgage. *Pro Se* pleadings were filed in that court case that were purportedly signed by Joseph Ernst. Again, Wells Fargo simply notes that the Plaintiff has conceded on multiple occasions that he altered his own signatures (Ex. 2, <u>J. Ernst. Depo</u>., p. 9:¶1-6; Ex. 1, <u>Hill Decl</u>. ¶ 16), so how the Plaintiff expected Wells Fargo to determine that other documents in its file and in response to the foreclosure were forged is unclear.

K.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "13."  The Plaintiff contends that "[a]ll of the known forgeries [by Thomas Ernst] from each of the above documents are collected on a single page as Exhibit "X." Wells Fargo simply refers the Court to its Exhibit 8, the composite of Plaintiff's known signatures. The only issue that is undisputed with regard to the signatures is that perhaps the Plaintiff's father more consistently signed the Plaintiff's name than did the Plaintiff.

L.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "14."  The Plaintiff contends that he "did not sign these documents and <u>did not even know of their existence</u> until these were produced to his attorneys in this Eastern District of Virginia action. <u>Ernst Decl</u>., Exhibit "A", ¶¶ 14-16; <u>Fed. R. Civ. P. 26(a)(2) Expert Witness Report of Robert Lesnevich</u>, a forensic document examiner ("Handwriting Expert Report"), Exhibit "Y."

The Plaintiff's contention that he did not know that these documents existed until Wells Fargo produced them in this case is in stark contrast to the Plaintiff's answer to Wells Fargo's Interrogatory Response, in which he claims, under oath, "once the Plaintiff learned his name has been used for fraudulent purposes, he went and pulled every document related to the Chatham property." Exhibit 9, Pl. Answer to Interr. No. 7. The Plaintiff also testified during his deposition that that he pulled copies of documents from New Jersey's online land records website. Ex. 2, J. Ernst Depo. p. 13:¶ ¶11-18. In addition, the Plaintiff's expert witness report of Robert Lesnevich is a summary of his opinion, and hardly an "undisputed fact."

M.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "15."  The Plaintiff contends that "[n]one of the signatures applying for, agreeing to pay or otherwise acknowledging the loan belonged to Joseph Ernst. None of the signatures on Exhibits H through W belonged to Mr. Ernst. Ernst Decl., Exhibit "A", ¶¶ 14, 16; Handwriting Expert Report, Exhibit "Y". In his expert report, Mr. Lesnevich opines that Mr. Ernst's did not sign the power of attorney. Mr. Lesnevich also opines that it is likely that the various Joseph Ernst signatures were forged by Thomas Ernst. Id. Again, Wells Fargo simply notes that the Plaintiff has conceded on multiple occasions that he altered his own signatures (Ex. 2, J. Ernst. Depo., p. 9:¶1-6; Ex. 1, Hill Decl. ¶ 16).

N.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "14. [sic]" The Plaintiff contends that "[i]n October 2008, after Plaintiff discovered that the mortgage had been taken out without his knowledge or consent, Plaintiff immediately notified Wachovia via phone, fax, regular mail and email. It took him over a year and a half, and transfers through two or more offices for the Plaintiff to speak with a person in a position to actually assist in his case, Kathleen Hill. Between phone calls, faxes, emails and regular mails, Plaintiff estimates that he

sent well over one hundred communications to Wachovia detailing this issue. Ernst Decl., Exhibit "A", ¶¶ 18-20.

Wells Fargo disputes that the Plaintiff was responsive or cooperative in his communications with Wells Fargo, and further that he purposely withheld information that would have aided Wells Fargo in its investigation. Indeed, the Plaintiff's failure in this regard include: (a) his failure to file a police report related; (b) withholding the fact that he resided at the property during the week between 2007 and 2009; (c) refusing to contact the notary; (d) failing to respond to Wells Fargo's inquiries for more information, (e) altering his own signature; and (f) failing to report a stolen wallet. Ex. 1, Hill Decl. Despite the numerous communications between the Plaintiff and Wells Fargo, it was his utter lack of willingness to assist Wells Fargo in its investigation that made it impossible to further assist the Plaintiff in his efforts to have the loan removed from reporting. Id.

In addition, the Plaintiff lied about living at the house. He told Ms. Hill that he "lived at the Property for three months in 2007 while attending law school, but did not live there at any other time." Ex. 1, Hill Decl. ¶ 11. Yet at his deposition, the Plaintiff acknowledged living in the house between 2007 and 2009, during the entire time he was disputing the loan.

O.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "15. [sic]" The Plaintiff contends that the documents the Defendant and the Plaintiff have produced in this case evidence each of these disputes and communications between Mr. Ernst and Wachovia [are summarized in Plaintiff's Exhibit B.

Such summary is not an accurate portrayal of the communications between the parties, and fail to acknowledge that the Plaintiff was unwilling to cooperate with Wells Fargo's requests for addition information. Ex. 1, Hill Decl. Moreover, the Plaintiff failed to take any action when Wells Fargo advised him that someone posing as the Plaintiff was repeatedly calling Customer

Service. Although Wells Fargo repeatedly and strenuously urged the plaintiff to place a password on the account, he failed to do so.

P.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "16."  The Plaintiff contends that "[s]ince at least October 2008, Wachovia has reported this fraudulent mortgage within Joseph Ernst's credit reports. It has reported the debt as having been opened by him, owed by him and defaulted by him. Wachovia also began to report its account within the Plaintiff's credit reports with a major derogatory payment history since January 2008. Finally, in June 2009, and thereafter, Wachovia reported to the Joseph Ernst's credit reports that he had suffered a foreclosure. Ernst Decl., Exhibit "A",¶¶ 21-22; Wachovia's credit reporting "ACDV" Dispute Forms ("ACDVs"), Exhibit "AA", WF Bates No. 01074-01082.

As a threshold matter on this point, the Plaintiff once again improperly cites to the record. Of the documents identified as Wells Fargo's ACDVs and designated as Exhibit "AA" (WF01704-01802), three of those documents (WF01077, 1080 and 1081) are actually Universal Data Forms ("UDF"), which are used by furnishers such as Wells Fargo to transmit to the CRAs updates to a credit report.

The Plaintiff's summary of the ACDVs in this case and Wells Fargo's credit reporting history is also inaccurate and misleading. Wells Fargo did not start reporting the loan as consistently delinquent until November 2008 (See Ex. 5, Wells Fargo's Responses to Plaintiff's Interrogatory No. 2). Coincidently, this is after the Plaintiff "learns" about the mortgage account for the first time, or when the IRS knocked on his door. Regardless of which story Plaintiff's elects to go with, Wells Fargo reported the account as current from August 2007, and continued to do so for several months. The Plaintiff would know this because his monthly credit monitoring service would have alerted him.

Q.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "17."  The Plaintiff contends that the "Wachovia credit reporting effectively removed the Plaintiff from the credit system" and relies on his expert's opinion for the "undisputed fact." Wells Fargo contends that the Plaintiff had poor credit notwithstanding the Wachovia mortgage.  <u>J. Ernst Depo</u>. Further, the Plaintiff's behavior only raised more suspicion.

R.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "18." The Plaintiff contends that "[i]n addition to the countless disputes and information provided directly to Wachovia, Mr. Ernst also made multiple FCRA disputes to Wachovia through the credit bureaus.  These FCRA disputes are collectively labeled Exhibit "CC", Ernst Bates Nos. 000520-00545, 00561-00576," and proceeds to list sixteen (16) separate items of correspondence with TransUnion, Experian and/or Equifax that occurred between January 15, 2009 and July 7, 2011. All but one transmittal to the CRAs allege that "indictments are pending." Wells Fargo disputes the Plaintiff's "Undisputed Fact No. 18" because the "Criminal Civil Cover Sheet" associated with the Thomas Ernst case is dated March 7, 2011 and marked "Under Seal."  **Exhibit 9,** <u>Criminal Cover Sheet</u>. Any claims by the Plaintiff (which he did twelve times between January 15, 2011 and March 1, 2011) prior to March 7, 2011 that an "indictment is pending" is false.

S.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "19."  The Plaintiff contends that "Wachovia has acknowledged that it received at least five disputes sent through Equifax, Trans Union and Experian. In the national credit reporting system, such disputes are communicated to a furnisher such as Wachovia as "ACDVs." <u>Hendricks Expert Report,</u> Exhibit "BB", p. 3-4. Defendant should have either (1) compared signatures; and/or (2) examined records in its possession that supported Plaintiff's claim; or (3) reviewed the indictment of Plaintiff's father; and/or (4) interviewed Plaintiff for any additional information it thought it needed; and/or (5) all of the above." <u>Hendricks Expert Report</u>, Exhibit "DD", p. 4.

Wells Fargo directs the Court to Ex. 8, a sampling of the signatures provided by the Plaintiff to Wells Fargo to date. A comparison of signatures would not (and did) assist Wells Fargo in its investigation because: (a) the Plaintiff's signature is inconsistent, and (b) he admits to altering the way he signs his name. The Plaintiff also suggests that Wells Fargo should have attempted to interview him, when in reality he failed to cooperate at every turn.

T.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "21." The Plaintiff contends that "[i]n response to each of the FCRA disputes that Wachovia admitted receiving and that are listed in response to Mr. Ernst's claim of a fraudulent account and/or identity theft, Wachovia responded that it had "verified" that the Plaintiff was properly identified as the person responsible for payment of its loan. Wachovia's responses to the credit bureaus are the actual ACDVs, attached as Exhibit "DD," WF Bates Nos.01130-1137.

Once again, the Plaintiff has not properly cited to the record. The documents labeled WF00130-1137 (designated by Plaintiff as Exhibit "DD") are not the ACDvs, but rather Wells Fargo internal task notes noting its responses to the ACDVs. The Plaintiff previously cited the ACDVs as Exhibit "AA," and partially referenced the correct documents. (see above). The results of Wells Fargo's investigation and reporting to the CRAs is summarized in Wells Fargo's Response to Interrogatory No. 2. Ex. 5

U.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "23."  The Plaintiff contends that:

> one of the Wachovia employees who received and processed an ACDV FCRA dispute testified at his deposition:
>
>> [W]hen we receive an – a ACDV we're basically just verifying the ID; because there's really no signature by the borrower. We can verify his name; we can verify his Social Security number; we can verify an address. That's- when we receive an ACDV that is pretty much what we can verify. Deposition of Juan Imperial, Exhibit "EE," p. 12, lns. 2-13.

Had the Plaintiff accurately and completely cited to Mr. Imperial's deposition, he would have included testimony that he starts his "research by going into MEM1, which is a screen that tells us if there are any legal matters or any kind of updates that were previously done." **Exhibit 10**, Juan Imperial Depo., p. 10:¶¶10-13. And in fact Mr. Imperial had personally handled a previous dispute on this account. Ex. 5, Wells Fargo's Response to Interr. 2. The Plaintiff sent a written dispute on July 2, 2009, which was received by the Credit Dispute Team on July 15. Mr. Imperial initiated an investigation, "called and left a message for Mr. Ernst [and] informed that we needed copy of CR report, SS#, copy of photo ID, as well as a current mailing address. [I] asked him to fax a letter. … [When Mr. Ernst failed to respond, no further action taken". As was his practice, the Plaintiff failed to respond to respond to Wells Fargo when tasked with specific requests.

U.      Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "24." Plaintiff contends that "[a]nother of the Wachovia employees who received and processed an ACDV FCRA dispute testified at her deposition:

> Q. Have you ever, in any of the credit reporting disputes
> that you've done, ACDVs disputes you've done,
> contacted the consumer who was making the dispute?
> A. Never. Deposition of Kathryn S. Fuller, Exhibit "FF", p 30, lns. 14-17.

At that same deposition, however, Ms. Fuller also testified (but conveniently omitted from the Plaintiff's Memorandum) that:

1.      She begins her ACDV response by opening all of the several programs she has at her disposal to conduct her research. Those programs include "Director, which is our main CPI program; there is the E-Oscar program … then I have Query which is our information wwhich stores all of the documents and files for customers, letters, things like that, then we have IAM … and Mobius." See **Exhibit 11**, K. Fuller Depo., p. 14:¶12 – p. 15:¶3.

2.     When asked for the dispute code 103 which of the programs did she use to process her ACDVs, Ms. Fuller replied "I would still use all of the different [programs] – all of the programs. Always." (Id. at p. 18:¶¶19-23.)

3.     For the July 11, 2011 ACDV Ms. Fuller "checked Query and went in … If he'd sent a copy of a police report, if he'd sent in anything in writing to verify his –his claim." (Id. at p. 32:¶8:11-16).

4.     Ms. Fuller was specifically asked if it was true that she went outside just the typical demographic verification and look for other documents within Wells Fargo's systems, to which she responded "Yes." (Id. at p. 34:¶24- p. 35:¶3.)  Having done so in the Plaintiff's case, she found no police reports or fraud affidavits.(Id. at p. 35:¶¶18-21.)   If she had seen anyting to support the Plaintiff's claim, she would "taken it to her manager immediately." (Id. at p. 36:¶3-7.)

V.     Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "25."  The Plaintiff contends that

> The third of the deposed Wachovia employees who received and processed an ACDV FCRA dispute testified:
>
> Q. All Right. And when you open the Fidelity screen, after you've confirmed in the task list that's assigned to you, what would you be looking to do within the CPI program?
>
> A. I would be looking to see if the information we have is the same as the information that was provided on the ACDV.
>
> Q. What categories of information are you referring to?
>
> A. First, middle, last name, any type of suffix on that;  Social Security number; and address and phone number. Deposition of Christopher James Caron, Exhibit "GG," p. 48, lns. 19-25, and p. 49, lns. 1-5.

Yet Mr. Carron also testified that he would also "look in our system to see if there were any type of notes as far as the borrower contacting us in another way. Like say, maybe they had

filled out a police report and submitted that. **Exhibit 12**, <u>Christopher Carron Depo.</u>, p. 54:¶¶1-7.
"I would check the notes and see if they had contacted another department … or submitted some
type of document claiming their identity was stolen. A police report or something like that." (<u>Id.</u>
at p. 54:¶¶21-25.)

W. Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "26."  The
Plaintiff contends that "[d]espite the numerous direct communications and the multiple FCRA
disputes, Wachovia never removed or corrected its credit reporting, even through the date of this
motion. <u>Ernst Decl.</u>, Exhibit "A", ¶ 25. Wells Fargo notes that documents attached to Plaintiff's
own Memorandum contradict this statement, as Wells Fargo noted that the account as "disputed"
with the inclusion of the XB code.

X. Wells Fargo disputes the "undisputed facts" designated by Plaintiff as "27." The
Plaintiff contends that "[d]espite the numerous direct communications and the multiple FCRA
disputes, Wachovia never reported to Equifax, Trans Union or Experian that the Mr. Ernst
disputed the Wachovia account, even through the date of this motion. <u>ACDVs</u>, Exhibit "DD",
WF Bates Nos.01130-1137. All it would have had to do is note the account with a code of "XB"
in the "Compliance Condition Code" field of its credit reporting. If it had done so, the account
would have been noted as disputed and would not have impacted his credit score. <u>Id.</u> Wells
Fargo notes the inaccuracy of the reference to Exhibit "DD," which it has explained before, are
not ACDVs but rather internal task notes. Wells Fargo refers the Plaintiff to the actual ACDVs
that contain the "XB" code.

## III.   ARGUMENT

### A.   <u>Summary Judgment Standard</u>

The Plaintiff is not entitled to summary judgment in this case. Partial summary
judgment is proper only if, viewed in the light most favorable to the non-moving party, the

pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Clark v. Alexander, 85 F.3d 146, 150 (4th Cir. 1996).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The essence of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.  "[T]he Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis." Aviles v. Equifax Info. Servs., 521 F. Supp. 2d 519, 522 (E.D. Va. 2007) (citing Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004)). Therefore, if a reasonable dispute exists "as to any material fact, then summary judgment is improper."   Mayberry v. Ememessay, Inc., 201 F. Supp. 2d 687, 692 (W.D. Va. 2002).  In addition, Rule 56(c) of the Federal Rules of Civil Procedure contemplates summary judgment only "after adequate time for discovery." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B.     Plaintiff is Not Entitled to Summary Judgment on his FCRA Claims.

Plaintiff seeks partial summary judgment on the issue of Wells Fargo's liability under the Fair Credit Reporting Act ("FCRA"), specifically 15 U.S.C. § 1681s-2(b)(1), claiming that (1) the information provided to the Credit Reporting Agency ("CRA") was inaccurate, (2) Wells Fargo's investigation into Plaintiff's claim that he did not authorize the mortgage loan was unreasonable, and (3) Wells Fargo failed to advise the CRAs that the account was in dispute. The Plaintiff is off base.

First of all, Wells Fargo's duties under 15 U.S.C. § 1681s-2(b)(1) "arise only after the furnisher receives notice of dispute from a CRA; notice of a dispute received directly from the

consumer does not trigger furnishers' duties." <u>Gorman v. Wolpoff & Abramson, LLP,</u> 584 F.3d 1147, 1154 (9th Cir. 2009). In addition, "[t]he burden of showing the investigation was unreasonable is on the plaintiff." <u>Chiang v. Verizon New England Inc.</u>, 595 F.3d 26, 37 (1st Cir. 2010). The plaintiff is also required to show "actual inaccuracies that a furnisher's objectively reasonable investigation would have been able to discover." <u>Id.</u> at 30. "The issue of whether the agency failed to follow 'reasonable procedures' will be a jury question [] in the overwhelming majority of cases." <u>Dalton v. Capital Associated Indus., Inc.</u>, 257 F.3d 409, 416-17 (4th Cir. 2001)(citation omitted).

### 1. **Plaintiff's Motion Should Be Denied Because Wells Fargo Conducted a Reasonable Investigation.**

Plaintiff claims Wells Fargo violated 15 U.S.C. § 1681e(b) by failing to conduct a "reasonable investigation" regarding Plaintiff's dispute. Plaintiff asserts that Wells Fargo "did not undertake <u>any</u> investigation" and "[a]ll that [Wells Fargo] did was data-match, comparing the name, address and social security number in its computer screen with the same fields in the 'ACDV' forms send by the reporting agencies." (Pl's Mot. for Partial Summ. J. 31.) Plaintiff has grossly misstated the facts.

Wells Fargo's investigation included opening all of the several programs at the employee's disposal to conduct research. Those programs include Director, the E-Oscar program, IAM, Mobius, and Query, which stores all of the documents and files for customers. (<u>K. Fuller Depo.</u>, p. 14:¶12 – p. 15:¶3.) For the July 11, 2011 ACDV, a Wells Fargo employee, Ms. Fuller, "checked Query and went in … If he'd sent a copy of a police report, if he'd sent in anything in writing to verify his –his claim." (<u>Id.</u> at p. 32:¶8:11-16). Ms. Fuller researched beyond the typical demographic verification and searched for other documents within Wells Fargo's systems. (<u>Id.</u> at p. 34:¶24- p. 35:¶3.) In conducting her research, Ms. Fuller did not discover any police reports or fraud affidavits. (<u>Id.</u> at p. 35:¶¶18-21.)

Another Wells Fargo employee, Juan Imperial, also investigated Plaintiff's dispute.  His investigation included "going into MEM1, which is a screen that tells us if there are any legal matters or any kind of updates that were previously done." (Imperial Depo., p. 10:¶¶10-13.)  Mr. Imperial also "called and left a message for Mr. Ernst [and] informed that we needed copy of CR report, SS#, copy of photo ID, as well as a current mailing address. [I] asked him to fax a letter. … [When Mr. Ernst failed to respond, no further action taken". As was his practice, Plaintiff failed to respond to Wells Fargo when tasked with specific requests.

During Wells Fargo's investigation, Plaintiff was unresponsive and unwilling to cooperate with Wells Fargo's requests for addition information.  In fact, he purposely withheld information that would have aided Wells Fargo in its investigation.  Plaintiff never filed a police report regarding the alleged identity theft, never contacted the notary despite being told that this was the first step to confirming his story if he was reluctant to file a police report, and acknowledged altering his own signature.  (Hill Decl.)  Moreover, Plaintiff failed to take any action when Wells Fargo advised him that someone posing as the Plaintiff was repeatedly calling Customer Service.  Although Wells Fargo repeatedly and strenuously urged Plaintiff to place a password on the account, he failed to do so.  Such failure to act only supports Wells Fargo's position that he continued to permit his father access to the account to "make it right" as Thomas Ernst had promised.

Plaintiff's claim that Wells Fargo's investigation was unreasonable as a matter of law fails for at least five reasons.  First, contrary to Plaintiff's motion, there is nothing unreasonable about Wells Fargo's investigation.  Setting aside Plaintiff's unsupported misstatement of the facts, the evidence above shows that Wells Fargo followed reasonable procedures in investigating Plaintiff's claim.  That evidence is fatal to Plaintiff's Motion and creates a reasonable dispute as to a material fact, preventing summary judgment.

Second, only the jury can determine whether the investigation was "reasonable." Indeed, as Plaintiff concedes in his motion, the issue of whether a reasonable investigation was conducted will be a jury question in the "overwhelming majority of cases." (Pl's Mot. for Partial Summ. J. 30-31)(citing Dalton, 257 F.3d at 416-17). In the very case that Plaintiff relies upon for the standard of "reasonable investigation," Johnson v. MBNA Am. Bank, *N.A.,* 357 F.3d 426 (4th Cir. 2004), the trial court denied summary judgment on the issue on whether the investigation was reasonable and the Fourth Circuit went on to affirm the ***jury verdict*** in which the ***jury*** found that the investigation was unreasonable. In fact, Plaintiff's counsel was counsel of record in the Johnson case and opposed summary judgment on that very issue. Curiously, counsel has filed a motion for summary judgment in this case, while at the same time arguing that the facts in this case are analogous to those presented to the ***jury*** in Johnson.

However, the facts in this case weigh even more in favor of denying summary judgment than in Johnson. As stated above, Wells Fargo conducted a "reasonable investigation." The evidence in Johnson was quite the contrary:

> MBNA's agents testified that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the CIS, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account. The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications.

*Id.* at 431.

Wells Fargo's investigation far exceeded the investigation conducted in Johnson, a case in which summary judgment was denied. See id. at 428. Furthermore, Johnson involved a Plaintiff who contended that she was simply an authorized user on the credit card and that she was not obligated for the indebtedness. Id. at 428-29. In contrast, the issue in this case is one of identity theft; whether the person making the dispute is the same person obligated on the

account.  This exact issue was present in both Westra v. Credit Control of Pinellas, 409 F.3d 825 (7th Cir. 2005) and Malm v. Household Bank, N.A., No. 03-4340, 2004 U.S. Dist. LEXIS 12981 (D. Minn. July 7, 2004), in which both courts affirmed/granted summary judgment in favor of the defendant furnisher, holding that the furnisher was only required by the FCRA to confirm the identity of the consumer.  This Court should apply the standard applied in Westra and Malm, as the facts are more analogous than those in Johnson.

Moreover, the Fourth Circuit affirmed the jury verdict in Johnson only after viewing the evidence in the light most favorable to the plaintiff.  Johnson, 357 F.3d at 431.  However, the opposite standard is applied at the summary judgment stage; the Court views the evidence in the light most favorable to the defendant, Wells Fargo.  See Clark, 85 F.3d at 150.  In Johnson, the issue of whether the investigation was reasonable was reserved for the jury to determine and was not determined as a matter of law, which is precisely what Plaintiff is asking the Court determine at this stage.  This Court should refuse to make such a determination given the evidence in this case, which creates a material factual dispute as to the reasonableness of Wells Fargo's investigation.

Third, as stated above, there is a genuine issue as to the accuracy of the Plaintiff's account.  There is clearly a genuine dispute as to the inaccuracy of Plaintiff's account, which can only be resolved by the jury.  See Cohen v. Trans Union, 67 F. App'x. 325, 328 (6th Cir. 2003); see also Wright v. TRW Credit Data, 588 F. Supp. 112, 114 (S.D. Fla. 1984); Boothe v. TRW Credit Data, 768 F. Supp. 434, 437 (S.D.N.Y. 1991) (holding that the threshold question is "whether the challenged information is accurate" and "[i]f the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary").

Fourth, Plaintiff cannot show that further investigation would have revealed that the default on his account was inaccurate.  Even if Plaintiff could show that Wells Fargo failed to

conduct a reasonable investigation, he would also need to show that a reasonable investigation would have revealed the inaccuracy in his credit report.  Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991); see also Stewart v. Credit Bureau, Inc., 734 F.2d 47, 55 (D.D.C. 1984).  Plaintiff, however, has no evidence, much less undisputed evidence, that an investigation would have revealed that he did not authorize his father to take out the mortgage loan.

Fifth, Plaintiff failed to submit requested information to Wells Fargo when asked to do so during Wells Fargo's investigation. Upon receiving Plaintiff's letter, Wells Fargo requested Plaintiff to submit his mailing address, a copy of the credit report, his social security number, a copy of his photo identification.  (Wells Fargo's Answers to Pl.'s First Set of Interrogs. No. 2 attached hereto as Ex. 5  However, Plaintiff failed to do so.  Furthermore, during Wells Fargo's investigation, a financial crimes analyst in Wells Fargo's Fraud Risk Management Division contacted the notary to acquire additional facts regarding the dispute; but the notary stated that he would only release information to Plaintiff.  (Wells Fargo's Answers to Pl's First Set of Interrogs. No. 3, Ex.5)  Wells Fargo promptly requested Plaintiff to contact the notary but upon requesting such information from Plaintiff, Wells Fargo discovered that Plaintiff had not yet contacted the notary to request the required information.  (Wells Fargo's Answers to Pl's First Set of Interrogs. No. 3, Ex. 5)

There is nothing unreasonable about Wells Fargo's requirement that Plaintiff support his dispute with additional information.  Plaintiff cannot now complain that the investigation was unreasonable when he refused to assist Wells Fargo in its investigation efforts.  Accordingly, given the factual dispute over whether Wells Fargo's investigation was reasonable, Plaintiff's motion for partial summary judgment on this issue must be denied.

Plaintiff also tries to bolster his claim of an "unreasonable investigation" but ends up muddying the waters by confusing "reasonable investigation" under the FCRA with allegations concerning reasonableness of the closing process for the underlying loan.  Plaintiff claims as an undisputed fact that, "Wachovia documents produced in this case by the Defendant reveal that the loan application and closing process should have put a reasonable lender notice of the fraud. The loan could not have occurred without Wachovia's blind eye."  Pl. Memo. in Support of MSJ, p.7, ¶9(a)-(k). Plaintiff cites to the underwriting process as evidence that Wells Fargo should have been on notice of fraud.   Then, somehow, Plaintiff tries to connect these underwriting allegations to his claim under the FCRA.  This the Plaintiff cannot do.

For example, in his statement of "Undisputed Material Facts," Plaintiff repeatedly references documents furnished during Wachovia's loan application and closing process. (Pl's. Mem. 5-9).  Plaintiff's reliance on these "facts" is misguided.  There is no implied cause of action under FCRA or any other federal statute allowing for a private party to attack a lender's underwriting process.  In fact, to the extent Plaintiff attacks the sufficiency and quality of Defendant's underwriting process, such causes of action have  repeatedly been held as within the exclusive purview of federal agency enforcement. See Unlu v. Wells Fargo Bank *NA*, 5:10-CV-5422 EJD, 2011 WL 6141036 (N.D. Cal. Dec. 9, 2011) (Where a plaintiff challenges a banks disclosure, as well as its servicing practices, "[s]uch claims are directed toward [the bank's] underwriting and loan origination procedures, and accordingly are preempted"). Causes of actions based upon allegations pertaining to Defendant's lending operations are preempted by federal statute, namely the Homeowners' Loan Act ("H.O.L.A.", 12 U.S.C. §§ 1461 et seq.  See Lopez v. Wachovia Mortg., 209-CV-01510-JAM-DAD, 2009 WL 4505919 (E.D. Cal. Nov. 20, 2009).

"Where Plaintiffs make allegations regarding the terms of credit provided by Defendant, disclosures that were or were not provided by Defendant, Defendants' underwriting standards, and Defendant's marketing and servicing of the loans, 'These activities are matters committed by Congress to regulation by a federal agency.' *Id.*, citing <u>Naulty v. GreenPoint Mortg. Funding, Inc.</u>, C 09-1542 MHP, 2009 WL 2870620 (N.D. Cal. Sept. 3, 2009). Thus, where the federal government has clearly occupied the field for attacking lenders' underwriting processes, Plaintiff cannot use violations of H.O.L.A., for which no private cause of action exist, to support a claim under the F.R.C.A.

## 2. **Plaintiff's Motion Should be Denied Because Wells Fargo Advised the CRAs that the Loan was Disputed.**

Plaintiff claims that Wells Fargo violated 15 U.S.C. § 1681s-2(b) by failing to advise the CRAs that the loan was disputed. Once again, Plaintiff has misstated the facts. There is evidence in the record proving that Wells Fargo advised the CRAs that the loan was disputed by the inclusion of the XB code. (Ex. 5, Wells Fargo's Interrogatory Responses, No. 2). Also, Plaintiff's Exhibit C to his Motion notes in the comment section that the "account in is dispute." Plaintiff's reliance on Exhibit "DD" is irrelevant because it includes mere internal task notes as opposed to the actual ACDVs that contain the "XB" code.

At best, this issue is a disputed material fact upon which the fact finder will need to weigh the evidence and make credibility determinations, which is an improper analysis in ruling on summary judgment. <u>See Aviles</u>, 521 F. Supp. 2d at 522. Accordingly, this Court should refuse to grant Plaintiff summary judgment on this issue.

## 3. **Plaintiff's Motion Should be Denied Because Whether the Information Reported Was Accurate is a Disputed Material Fact.**

As a threshold matter, Plaintiff must prove that the credit report actually contained inaccurate information. <u>Beattie v. Nations Credit Fin. Servs. Corp.</u>, 69 F. App'x 585, 591 (4th

Cir. 2003). Wells Fargo disputes Plaintiff's allegation that the information reported on his credit report (Plaintiff's default on his mortgage) was inaccurate. There is evidence in the record that would lead a reasonable jury to conclude that Plaintiff authorized his father to take out the mortgage loan. Thus, any default on such mortgage would be accurate.

Plaintiff purposely withheld information that would have aided Wells Fargo in its investigation about the mortgage loan. He never filed a police report; never contacted the notary despite being told that this was the first step to confirming his story if he was reluctant to file a police report; acknowledged altering his own signature; and, claimed his father had stolen his wallet but, one again, did not file a police report. Hill. Decl. In addition, Plaintiff lied about living at the house. He told Ms. Hill that he "lived at the Property for three months in 2007 while attending law school, but did not live there at any other time." Ex. 1, Hill Decl. ¶ 11. However, at his deposition, the Plaintiff acknowledged living in the house between 2007 and 2009, during the entire time he was disputing the loan. J. Ersnt Depo.

It is important to note that Wells Fargo did not start reporting the loan as consistently delinquent until November 2008 (See Ex. 5, Wells Fargo's responses to Plaintiff's Interrogatory No. 2). Coincidently, this is just the Plaintiff "learns" about the mortgage account for the first time, or when the IRS knocked on his door. Regardless of which story Plaintiff's elects to go with, Wells Fargo reported the account as current from August 2007, and continued to do so for several months. The Plaintiff would know this because (a) he was cooperating with his father; or (b) his monthly credit monitoring service would have alerted him.

In light of the evidence in the record, set forth above, that would lead a reasonable jury to conclude that Plaintiff authorized his father to take out the mortgage loan, the evidence in this case is sufficient to raise a disputed issue on material regarding whether the credit report was accurate. These facts are not analogous to the facts in Alabran v. Capital One Bank, No. Civ.A

3:04CV935, 2005 WL 3338663 (E.D. Va. Dec. 8, 2005) in which the Plaintiff was an authorized user of the credit card but was not liable for the indebtedness.  The Court held as a matter of law that the information contained on the credit report was inaccurate based upon the fact that the Defendant never produced the credit card application and never contended that Plaintiff signed as a co-obligor.  Id. at *8 n.10.  This case relates to an alleged identity theft.  Wells Fargo has the loan documents; in fact, Plaintiff attached them as exhibits to his Motion.  Moreover, Wells Fargo has contended throughout this litigation that Plaintiff authorized the loan and is therefore obligated to re-pay the balance.  Due to the presence of this genuine dispute, a fact finder will need to weigh the evidence and make credibility determinations, which is an improper analysis in ruling on summary judgment.  See Aviles, 521 F. Supp. 2d at 522.  As this factual dispute is a threshold matter that will prevent Plaintiff from prevailing on any of his FCRA claims, for this reason alone, this Court should deny Plaintiff's Motion in its entirety.

## IV.  CONCLUSION

For the reasons stated, Plaintiff's Motion for Partial Summary Judgment should be denied[3].

---

[3] As set forth herein, Wells Fargo has provided the Court with a significant number of material facts that are genuinely in dispute which preclude entry of partial summary judgment as requested by the Plaintiff.  In addition, as set forth below (and as the Plaintiff begrudgingly acknowledges in his brief), "The issue of whether the agency failed to follow 'reasonable procedures' will be a jury question [] in the overwhelming majority of cases." Dalton v. Capital Assoc. Indus., Inc., 257 F.3d 409, 416-17 (4th Cir. 2001).

Even so, there are a number of additional facts that have not yet been disclosed or that Wells Fargo is currently undertaking to develop through discovery which cannot yet be presented to the Court in its Opposition. Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, attached is the Declaration of Terry C. Frank detailing the depositions, expert reports, subpoena responses, and discovery responses that Wells Fargo would also rely upon to oppose Plaintiffs Motion for Partial Summary Judgment if provided the opportunity by this Court.  See Exhibit 13.

**WELLS FARGO BANK, N.A.**


By:_____ */s/ Terry C. Frank*_____
Hunter W. Sims, Jr. (VSB No. 09218)
Email:  hwsims@kaufcan.com
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
(757) 624-3000
(757) 624-3169 Facsimile

Terry C. Frank(VSB No. 74890)
Email:  tcfrank@kaufcan.com
KAUFMAN & CANOLES, P.C.
Two James Center
1021 E. Cary St., 14th Floor
Richmond, VA 23219
(804) 771-5700
(804) 771-5777 Facsimile
*Counsel for Defendant Wachovia Mortgage,*
*a division of Wells Fargo Bank, N.A.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2012, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following:

Leonard A. Bennett, Esquire
E-mail: lenbennett@cox.net
Susan M. Rotkis, Esquire
E-mail: srotkis@clalegal.com
Consumer Litigation Associates, PC
763 J. Clyde Morris Blvd. 1-A
Newport News, VA 23601
(757) 930-3660
(757) 930-3662 facsimile
**Counsel for Plaintiff**

Kristi Cahoon Kelly, Esquire
E-mail: kkelly@smillaw.com
Surovell Isaacs Petersen & Levy, PLC
4010 University Drive, Suite 200
Fairfax, VA  22030
Phone:  703/277-9774
Fax:     703/591-2149
**Counsel for Plaintiff**


By:___/s/ Terry C. Frank_____
Terry C. Frank(VSB No. 74890)
Email:  tcfrank@kaufcan.com
KAUFMAN & CANOLES, P.C.
Two James Center
1021 E. Cary St., 14th Floor
Richmond, VA 23219
(804) 771-5700
(804) 771-5777 Facsimile
 *Counsel for Defendant Wachovia
Mortgage, a division of Wells Fargo Bank,
N.A.*

11516377_1.DOC