# REPORT OF JEAN NOONAN

At the request of counsel for defendant Wachovia Mortgage, a division of Wells Fargo Bank, N.A. ("Wells Fargo"), I have prepared this report for use in the case of *Ernst v. Experian Information Solutions, Inc. et al.*, pending under Case No. 3:11-cv-00625-HEH in the United States District Court for the Eastern District of Virginia, Alexandria Division.

## I. QUALIFICATIONS

I am a partner with the law firm of Hudson Cook, LLP. For more than 30 years, my work has involved the interpretation of federal and state consumer protection laws concerning the consumer financial services industry. My work has involved legal advocacy on behalf of consumers, regulation of lenders, compliance counseling for creditors and consumer reporting agencies, and teaching consumer finance law.

I spent my first 14 years of legal practice with the Federal Trade Commission's Bureau of Consumer Protection in Washington, D.C. I served as the director of the Federal Trade Commission's Division of Credit Practices, where I was responsible for the nationwide enforcement of the federal consumer credit laws, including the Fair Credit Reporting Act. In that capacity, I oversaw the development of the FTC's formal interpretations of the FCRA, including the FTC's Commentary on the FCRA. I was also personally involved in the FTC's initiatives to protect consumers from identity theft involving credit card fraud and misuse. These initiatives included developing consumer education materials and programs, and increasing consumer awareness of credit card identity theft through numerous newspaper and radio interviews and television appearances. I prepared the Commission's testimony to Congress on matters relating to the regulation of the consumer financial services industry and testified on behalf of the Commission on several occasions in hearings regarding credit repair fraud and legislation to strengthen consumer protections under the FCRA.

For the next 10 years I served as General Counsel to the Farm Credit Administration, a Federal bank regulatory agency charged with supervising the Farm Credit System, a farmer-owned cooperative system of banks and lending associations. Ensuring the Farm Credit lenders' compliance with the consumer credit laws was part of my responsibility. During this period I also taught a law school course on consumer transactions. The course covered, among other topics, the Fair Credit Reporting Act.

In my current law practice, I counsel creditors in their compliance responsibilities under State and Federal laws. Since 2001, when I entered private practice, I have worked on many issues under the FCRA with clients in the consumer financial services industry. I have also defended clients in law enforcement investigations brought by the FTC.

HC# 4851-8118-5038

I am an active member of the American Bar Association and have held a number of leadership positions in the Business Law Section's Consumer Financial Services Committee, including chair of the Federal and State Trade Practices Subcommittee and vice-chair of the Privacy subcommittee. I am a founding member of the American College of Consumer Financial Services Lawyers, a professional association of lawyers particularly skilled and experienced in handling consumer finance matters and dedicated to the improvement and enhancement of the skill and practice of consumer financial services law and the ethics of the profession. In 2003 I was elected to the Governing Board of the Conference on Consumer Finance Law, the nation's oldest legal association for consumer finance lawyers. Membership in both the American College of Consumer Financial Services Lawyers and the Conference on Consumer Finance Law is only by invitation.

For my work in this matter, I am being compensated at a rate of $665 per hour. My detailed qualifications in the form of a *curriculum vitae,* list of publications authored during the preceding ten years, and list of the cases in which I have testified by deposition or at trial during the preceding four years are attached as Attachment A hereto.

## II. INFORMATION CONSIDERED

In preparing this report, I have relied on pleadings, deposition transcripts, and documents produced by the parties in this matter and the plaintiff's complaint. A complete list of these documents is Attachment B to this report. If other documents are made available to me, I reserve the right to amend or modify this report accordingly.

## III. SUMMARY OF OPINIONS

The basis and reasons for each opinion expressed herein are set forth in this Report. In summary, my opinions are as follows:

1. The requirements and procedures for reporting information accurately to a consumer reporting agency and for reinvestigating disputed information and correcting it when appropriate are governed by the Fair Credit Reporting Act. Whether a creditor's reinvestigation is reasonable depends in part on the details it receives regarding the basis for the consumer's dispute. A creditor is not required to reinvestigate a dispute that is frivolous or irrelevant, including a dispute previously submitted and investigated that contains no new information.

2. To meet their obligations under the FCRA, creditors that furnish information to consumer reporting agencies develop procedures to reinvestigate and correct information disputed to them directly by consumers and by consumer reporting agencies. The actions Wells Fargo took in response to the Plaintiff's direct disputes and disputes submitted through consumer reporting agencies were reasonable and consistent with industry practice.

## IV. BACKGROUND OF THE FAIR CREDIT REPORTING ACT

### A. Role of Credit Reports in U.S. Economy.

Some background regarding the FCRA provides useful context in this case. In enacting the FCRA, the U.S. Congress recognized that the efficient functioning of the consumer reporting industry was vital to the U.S. economy. In section 602(a)(1) [15 U.S.C. § 1681(a)(1)], Congress specifically found that the U.S. "banking system is dependent upon fair and accurate credit reporting." Moreover, in section 602(a)(2) [15 U.S.C. § 1681(a)(2)], Congress recognized that the consumer reporting system was a vital and "elaborate mechanism" for investigating and evaluating … creditworthiness…." The functioning of the U.S. economy is, in large measure, based on a consumer reporting system that is most often accurate enough to permit creditors to make informed credit granting decisions.

Billions of items of tradeline information are furnished to consumer reporting agencies each month, resulting in the creation and maintenance of files on more than 200 million consumers, with more than 1.5 billion consumer reports issued annually.[1] Creditors benefit because readily available credit information enables them to offer more credit, incur less default risk, and obtain greater lending capital through the bundling and selling of consumer credit obligations in the secondary market.[2] Consumers benefit

---

[1] Federal Trade Commission, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003 (2004), pp. 8-9, http://www.ftc.gov/reports/facta/041209factarpt.pdf.

[2] Water F. Kitchenman, *U.S. Credit Reporting: Perceived Benefits Outweigh Privacy Concerns*, The Tower Group, p. 7 (1999).

because they have easy access to credit and pay less for credit extended.[3] America's consumer reporting system is unequaled in the world in terms of scope and benefits.[4]

The U.S. consumer reporting system evolved and operates on a purely cooperative basis; there is no legal requirement that any entity furnish information to a consumer reporting agency.

### B. Accuracy of Information in Consumer Reports

The FCRA does not define "accuracy" of consumer report information, but the term is defined in rules jointly issued by the FTC and the federal banking agencies to implement certain provisions of that Act, as amended by the FACT Act of 2003.[5] These rules, which have the force and effect of law, apply to creditors and other furnishers when they furnish consumer information to a consumer reporting agency ("CRA") and when they receive disputes directly from the consumer regarding the accuracy of information furnished to the CRA.[6] Under these rules,

> "Accuracy" means: that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly:
> (1) Reflects the terms of and liability for the account or other relationship;
> (2) Reflects the consumer's performance and other conduct with respect to the account or other relationship; and
> (3) Identifies the appropriate consumer."[7]

As stated by the FTC, the FCRA does not establish an absolute standard of accuracy and does not require consumer reporting agencies to guarantee that reports are

---

[3] Kitchenman, *U.S. Credit Reporting*, p. 7; *see also* Staten and Cate, *The Impact of National Credit Reporting Under the Fair Credit Reporting Act: The Risk of New Restrictions and State Regulation*, (May 2003), p. vii, http://www.ftc.gov/bcp/workshops/infoflows/statements/cate02.pdf.

[4] Staten and Cate, *The Impact of National Credit Reporting Under the Fair Credit Reporting Act*, pp. iii, v-vi; *see also* Fred H. Cate and Richard J. Varn, *The Public Record: Information Privacy and Access – A New Framework for Finding the Balance* (1999), p. 11, http://it.ojp.gov/initiatives/files/Public_Record.pdf

[5] *See* Sections 312 and 316 of the "Fair and Accurate Credit Transactions Act ("FACT Act") of 2003, Pub.L. 108-159.

[6] *See* 16 C.F.R. Part 660.

[7] 16 C.F.R. § 660.2(a).

error-free.[8] Moreover, the Federal Reserve Board staff study found that, in the vast majority of cases, the information furnishers report is accurate.[9] According to a recent FTC Report to Congress, approximately 18% to 22% of consumers who obtained file disclosures from a consumer reporting agency in 2003 disputed information in their credit files.[10] In stark contrast to this seemingly high number, the Report included a chart showing that only 0.18% of all accounts reported by one nationwide consumer reporting agency had pending disputes.[11] Furnishers usually resolve disputes by modifying information or deleting information; if the information is accurate, furnishers verify the information.[12]

These government findings are also borne out by a recent independent study conducted by the Political and Economic Research Council (PERC) examining the accuracy of consumer credit reports.[13] PERC surveyed 2,338 participants from February 2010 to May 2010 and examined those participants' credit reports. There were four major findings released from the study:

- Fewer than one percent (0.93%) of the credit reports examined had one or more disputes that resulted in a credit score increase of 25 points or greater.
- One-half of one percent (.50%) of all credit reports examined by participants had credit scores that moved to a higher "credit risk tier" as a result of a modification.
- 95% of disputing participants were satisfied with the dispute resolution process under the FCRA.
- Fewer than one percent (.54%) of credit, collections, and public record

---

[8] Prepared Statement of The Federal Trade Commission on Credit Reports: Consumers' Ability To Dispute and Change Inaccurate Information, Before the House Committee On Financial Services, June 19, 2007, p. 4.

[9] *See* Robert B. Avery, Paul S. Calem & Glenn B. Canner, *Credit Report Accuracy and Access to Credit*, Federal Reserve Bulletin (Summer 2004): "This analysis of the effects of data problems on credit history scores indicates that the proportion of individuals affected by any single type of data problem appears to be small." *See also:* 2006 Report to Congress at Appendix D, Table 1, showing pending disputes at .18%.

[10] *See, e.g.,* 2 Federal Trade Commission and Board of Governors of the Federal Reserve System Report to Congress on the Fair Credit Reporting Act Dispute Process (August 2006) ("2006 Report to Congress"), p. 12.

[11] *Id.*, Appendix D.

[12] *Id.*, p. 24.

[13] U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts, Political and Economic Research Council (May 2011) http://perc.net/files/DQreport.pdf; http://perc.net/files/press_releases/May%202011%20News%20Release.pdf (Press Release).

tradelines examined under the study contained information that was disputed.

In addition, data from www.annualcreditreport.com shows that 89% of the credit file disclosures issued resulted in no disputes. There are a number of points to consider with regard to the 11% of consumers who did submit a dispute:

- The 11% dispute rate is low by all measures. The GAO's 2004 FACT Act required survey of consumers regarding credit report literacy suggested that dispute rates ranged from 18% to 21.8% of the disclosures made to consumers. In fact, a CDIA study conducted in 1991 showed a dispute rate of 25% of disclosures.

- Out of 52 million credit file disclosures reviewed by consumers, only 1.98% of these resulted in a dispute where data was deleted.

- Many disputes, perhaps as much as 55% are, in reality, a request for an update of accurate data.

- Other disputes are submitted by credit repair agencies and have nothing to do with the accuracy of data.

- A dispute is not synonymous with an error which is consequential and which will lead to an adverse result.[14]

### C. Furnisher Obligations under the FCRA.

When Congress amended the FCRA to impose duties on furnishers of information and users of consumer reports, it recognized the value of robust consumer reporting agency files and also understood the inevitability of errors and the voluntary nature of consumer reporting. For these reasons, while the FCRA imposes certain duties upon furnishers regarding the accuracy of information furnished, the duties may only be enforced by certain designated federal agencies and the state attorneys general.[15]

---

[14] Statement of Stuart K. Pratt, Consumer Data Industry Association, Before The Committee on Financial Services House of Representatives on "Credit Reports: Consumers' Ability to Dispute and Change Inaccurate Information," June 19, 2007 ("CDIA Testimony on Accuracy"), p. 9.

[15] *See* FCRA § 623(a) (setting forth the duties of "furnishers of information to provide accurate information"); *see also* section 623(d) ("Subsection (a) shall be enforced exclusively under section 621 [§ 1681s] by the Federal agencies and officials and the State officials identified in that section.").

When a consumer reporting agency receives a consumer's notice of dispute, it notifies the furnisher of the consumer's dispute and provides relevant information about the dispute.[16] The furnisher then conducts an investigation with respect to the disputed information, reviews all relevant information received from the consumer reporting agency, and informs the consumer reporting agency of the results.[17] If its investigation determines that the information is inaccurate, the furnisher must report the results of its investigation to all of the consumer reporting agencies that operate nationwide and to whom the furnisher provided the information.[18] If the furnisher cannot verify the accuracy of the disputed information, the consumer reporting agency must delete the information and the furnisher must cease furnishing the information to consumer reporting agencies.[19] The FCRA does not mandate that furnisher change information reported merely because a consumer disagrees with or is unhappy with the information reported.

The FCRA does not specify what information the furnisher should report back to the consumer reporting agency. Because the purpose of Section 623(b) [15 U.S.C. § 1681s-2(b)] is to correct inaccurate and incomplete information in consumers' files at consumer reporting agencies, Congress intended that investigations under this section be reasonably designed to achieve that purpose. Implicit in a furnisher's duties under Section 623(b) are the requirements that: (1) in conducting the investigation, the furnisher follow procedures reasonably designed to determine the accuracy and completeness of the disputed information; and (2) the furnisher report accurately to the consumer reporting agency the results of its investigation. If the furnisher follows reasonable procedures and reports accurately the results of the investigation, the furnisher fulfills its investigation duties under the FCRA, even if the furnisher reaches an erroneous conclusion based upon the information.

If a furnisher fails to fulfill its investigative duties upon receipt of a consumer reporting agency's notice of a consumer's dispute, the consumer may have a private right of action against the furnisher. If, however, a furnisher does fulfill its duties, but despite following reasonable investigation procedures, reaches an erroneous conclusion based upon the information investigated, the furnisher is not liable for the error and cannot be liable to the consumer for information furnished to the consumer reporting agency based on the error. To hold the furnisher liable in that case would be to create a private right of action based on information furnished to a consumer reporting agency. That result would

---

[16] *See* 15 U.S.C. § 1681i(a).
[17] *See* 15 U.S.C. § 1681s-2(b).
[18] *See* 15 U.S.C. § 1681s-2(b)(1)(D).
[19] *See* 15 U.S.C. § 1681i(a)(5)(A) ("If, after any reinvestigation …, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete the item…").

HC# 4829-7966-1326    7

be entirely inconsistent with Congress's determination that there be no such right of action against furnishers based upon the information they furnish to consumer reporting agencies.

### D. Claims of Identity Theft

A consumer's claim of identity theft is one of the most difficult for a furnisher to investigate and verify. This is especially true when all facts about the consumer in the creditor's possession match the facts the consumer provides. Even in cases of true identity theft, the thief will often be required to fabricate some facts unknown to the thief, and these discrepancies will assist the furnisher in verifying the consumer's claim.

In recognition of the special challenges regarding claims of identity theft, Congress established procedures for consumers to use to block information resulting from identity theft. FCRA section 605B requires a consumer reporting agency to block information in the consumer's file that the consumer alleges results from identity theft if the consumer provides:

(1) appropriate proof of the identity of the consumer;

(2) a copy of an identity theft report;

(3) the identification of such information by the consumer; and

(4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

### V. FACTUAL BASIS FOR OPINIONS

Throughout much of the time period Plaintiff disputed the Wells Fargo mortgage loan, Plaintiff notably did not provide critical information reasonably requested by Wells Fargo in order to reinvestigate his dispute and claim of identity theft. First, he refused to respond to repeated requests for information regarding his identity, such as a current mailing address.[20] Plaintiff even declined to put a password on his account to protect his information after Wells Fargo warned him someone was trying to access information about the challenged account.[21] Creditors like Wells Fargo develop security procedures

---

[20] Wells Fargo's Response to Interrogatory No. 2 - Telephone messages to plaintiff on 11/5/08, 12/26/08 and 7/15/09.

[21] Email correspondence between plaintiff and Yessica Ortiz (April-June 2011)(See WF 0097, 98, 100-101).

to protect their customers' sensitive and confidential financial information. In cases of alleged identity theft, these procedures are especially critical. Yet Plaintiff rebuffed Wells Fargo's attempts to add this layer of security, which is a typical procedure to ensure the bank is communicating with the customer and not an imposter.[22] In response to the request to add a password, Plaintiff asked Wells Fargo to screen his identity based on incoming calls from his cell phone number or an "email string."[23] Rather than comply with the security procedures that Wells Fargo had established, and which are standard in the industry, Plaintiff attempted to dictate his own procedures in lieu of the bank's. Ignoring reasonable and customary requests from the bank as it attempted to investigate his claim of identity theft was, unfortunately, a pattern in Plaintiff's communications with Wells Fargo.[24]

Even more significant, Plaintiff did not file an identity theft report. Identity theft reports under the FCRA can take many forms. A police report with federal, state, or local law enforcement agencies will suffice. Even an identity theft affidavit obtainable from the FTC's website will satisfy this requirement.[25] The key feature of an identity theft report is that it subjects the consumer to criminal penalties relating to the filing of false information if, in fact, the information in the identity theft report were false.[26] It is easy for a person to falsely claim being a victim of identity theft, and it can be hard for a creditor to confirm or disprove such a claim. The FCRA resolves this dilemma in the consumer's favor, provided that the consumer simply submits a proper identity theft report.[27]

Wells Fargo offered Plaintiff other options to help it investigate this fraud claim, which Plaintiff similarly rebuffed. A key document in the case was the Power of Attorney that Plaintiff's father used to obtain the mortgage in Plaintiff's name. When Wells Fargo contacted the person who notarized the Power of Attorney for information about the form of identity provided by the person who signed as Joseph Ernst, the notary explained that, to protect Joseph Ernst's privacy, the request must come from Mr. Ernst.[28] Wells Fargo conveyed the necessary information to Plaintiff, but he did not cooperate

---

[22] Email chain dated June 10, 2011 between plaintiff and Yessica Ortiz. WF0097.

[23] Email chain dated June 10, 2011 between plaintiff and Yessica Ortiz

[24] Wells Fargo's Responses to Interrogatory No. 2 - telephone messages to plaintiff on 11/5/08, 12/26/08 and 7/15/09; email correspondence between plaintiff and Yessica Ortiz (April-June 2011)(See WF 0097, 98, 100-101); Declaration of Kathleen Hill( filed in Wells Fargo's Opp. to Plaintiff's Motion for Summary Judgment); Report of Kathleen Hill (WF009).

[25] http://www.ftc.gov/bcp/edu/pubs/consumer/idtheft/idt04.pdf.

[26] FCRA § 603(q)(4); 15 U.S.C. § 1681a(q)(4).

[27] FCRA § 605B; 15 U.S.C. § 1681c-2.

[28] Report of Kathleen Hill (WF009).

with Wells Fargo in seeking this information.[29]

In my experience, consumers who are victims of true identity theft are eager to provide the documentation a creditor requests that will allow the creditor delete the disputed information. On the other hand, a consumer who refuses to comply with such basic requests and instead simply parrots the same general and unsubstantiated claim repeatedly, may raise a creditor's reasonable suspicion regarding the veracity of the claim.

In short, Plaintiff ignored or rebuffed Wells Fargo's reasonable and customary requests for information that would enable the bank to reinvestigate his claim of identity theft and would have resulted in blocking the challenged information, as the FCRA requires. Instead, he repeatedly sent nearly identical disputes, without adding new information or addressing the bank's requests. The record indicates the bank devoted what must have been a considerable amount of time to this dispute, with little actual cooperation from Plaintiff.

## VI. CONCLUSION

Based upon my more than 30 years' experience in the consumer reporting industry, I conclude that Wells Fargo conducted a reasonable investigation of the Plaintiff's dispute that conformed to industry standards.

*[signature]*

Jean Noonan             Dated: February 6, 2012

---

[29] Report of Kathleen Hill (WF009); Kathleen Hill Declaration (filed in Wells Fargo's Opp. to Plaintiff's Motion for Summary Judgment.

HC# 4829-7966-1326        10