Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

| | |
|---|---|
| JOSEPH R. ERNST | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| vs. | ) NO. 3:11-CV-00624-HEH |
| | ) |
| EXPERIAN INFORMATION | ) |
| SOLUTIONS, INC., TRANS | ) |
| UNION, LLC, and WACHOVIA | ) |
| MORTGAGE, a Division of | ) |
| Wells Fargo Bank, N.A., | ) |
| | ) |
| Defendant(s). | ) |

*************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
KATHLEEN C. HILL
FEBRUARY 9, 2012

*************************************************************

   Oral and videotaped deposition of KATHLEEN C.

HILL, produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the above-styled

and numbered cause on the 9th day of February, 2012,

from 11:16 a.m. to 2:06 p.m., before Ranae McDermott,

RMR, CRR, in and for the state of North Carolina,

reported by machine shorthand, and at the offices of

K & L Gates, 4350 Lassiter at North Hills Avenue, Suite

300, Raleigh, North Carolina, 27609, pursuant to the

Federal Rules of Civil Procedure and the provision

stated on the record or attached hereto.

```
11:36   1          Q.   Well, taking a look at Exhibit 4, your
11:36   2    report -- and, actually, let me -- what -- what do you
11:36   3    understand Joseph Ernst's dispute to be, my client's
11:36   4    dispute to be?
11:36   5          A.   That -- what it came down to was that he did
11:36   6    not sign the power of attorney.
11:37   7          Q.   And did he sign the power of attorney?
11:37   8          A.   I don't know.
11:37   9          Q.   To this day, you don't know whether he signed
11:37  10    the power of attorney?
11:37  11          A.   Have -- has any conclusions been made on that?
11:37  12          Q.   Well --
11:37  13               MS. FRANK:   Len, this is Terry.  I mean,
11:37  14    I think what we're willing to stipulate that the power
11:37  15    of attorney was a forgery.  I mean, her -- her
11:37  16    investigation, I believe, is the topic of your
11:37  17    investigation, so...
11:37  18               We -- what she has -- what knowledge she
11:37  19    has is not -- hasn't come from her investigation.  It
11:37  20    would have been something that counsel told her.
11:37  21               MR. BENNETT:   Okay.
11:37  22          Q.   (By Mr. Bennett) Well, during your
11:37  23    investigation, were you able to determine or verify that
11:37  24    Joseph Ernst was the person that signed the power of
       25    attorney?
```

```
11:53  1        Q.   Do you understand what that would have been
11:54  2   about?
11:54  3        A.   I am not sure.  It may be -- I mean, the banks
11:54  4   sent out letters to many people that were behind in
11:54  5   their payments.  It may have something to do with that,
11:54  6   but I really don't know.
11:54  7        Q.   And then can you read what Mr. Ernst said in
11:54  8   response in summarizing his complaint in responding to
11:54  9   Ms. Ortiz's suggestion of a compromise?
11:54 10        A.   Yes.  I see that that's above what her -- her
11:54 11   last e-mail.
11:54 12        Q.   Um-hum.  Can you read what Mr. Ernst said?
11:54 13        A.   Um-hum.  Hope all is well.  That's one of our
11:54 14   core issues.  There was never a loan, never received any
11:54 15   monies of any sort.  As you know, this was and remains a
11:55 16   part of the identity fraud perpetrated against me.  I
11:55 17   will of course read with interest anything I receive.
11:55 18        Q.   Now, that is what he was disputing.  That was
11:55 19   his complaint, right; that there was never a loan, he
11:55 20   never received any monies of any sort from your bank?
11:55 21        A.   Yes.
11:55 22        Q.   Now, the next page -- which advancing in time,
11:55 23   page 50 -- there's a discussion -- or there's an e-mail
11:55 24   from Ms. Ortiz, April 21, that says:  I would like to
      25   speak to you about possibly adding a password on the
```

```
01:08  1   paragraph 9, page 2.  Can you read paragraph 9?
01:08  2       A.   Mr. Ernst denied giving anyone, including his
01:08  3   father, a power of attorney or other similar control
01:08  4   over his personal or business affairs.
01:08  5       Q.   And did you in your investigation find any
01:08  6   evidence to refute that denial?
01:08  7       A.   I -- I found nothing to refute or to prove it
01:08  8   either way.
01:08  9       Q.   Well, you -- you -- you heard the stipulation
01:08 10   that the power of attorney was forged, right?
01:08 11       A.   Yes.
01:08 12       Q.   Are you aware of -- other than that forged
01:08 13   power of attorney, are you aware of any other basis by
01:09 14   which Wachovia would claim my client gave the father
01:09 15   control over his personal or business affairs?
01:09 16       A.   Could you explain that?  I...
01:09 17       Q.   Sure.  There's the power of attorney that's
01:09 18   formed the basis for this loan, right?
01:09 19       A.   That's -- that formed the basis of the
01:09 20   signature of Mr. Ernst, Thomas Ernst, on all the
01:09 21   documents in the file.
01:09 22       Q.   That's right.  There aren't any -- I mean, my
01:09 23   client didn't sign the note or signed the mortgage,
01:09 24   right?
      25       A.   That's correct.
```

```
01:09  1      Q.   Those were signed by Thomas Ernst claiming he
01:09  2   had my client's power of attorney, correct?
01:09  3      A.   That's correct.
01:09  4      Q.   And that power of attorney we all now agree
01:09  5   was a forgery, right?
01:09  6      A.   That's correct.
01:09  7      Q.   Is there any other -- other than that power of
01:10  8   attorney, is there any other basis that you believe that
01:10  9   Wachovia had to doubt what Mr. Ernst said in paragraph
01:10 10   9, that he did not give his father power of attorney or
01:10 11   other similar control over his personal or business
01:10 12   affairs?
01:10 13      A.   I can't say one way or the other.  All we had
01:10 14   was mortgage documents in front of us.
01:10 15      Q.   Okay.  Now, No. 10, Mr. Ernst did not file a
01:10 16   police report related this forgery, correct?
01:10 17      A.   As far as I know.
01:10 18      Q.   Are you aware of whether or not Wachovia filed
01:10 19   a police report related to this forgery?
01:10 20      A.   I know our department did not.
01:10 21      Q.   Are you aware of anyone at Wachovia or any
01:10 22   other department that filed a police report related to
01:11 23   this forgery?
01:11 24      A.   I am not aware.
      25      Q.   And at paragraph 12, you say you spoke to --
```

| | | |
|---|---|---|
| 01:29 | 1 | EXAMINATION |
| 01:29 | 2 | BY MS. FRANK: |
| 01:29 | 3 | Q. Ms.Hill, as you know, I'm Terry Frank, counsel |
| 01:29 | 4 | for Wells Fargo. I just wanted to ask you a couple of |
| 01:29 | 5 | questions about the testimony you just gave. |
| 01:29 | 6 | If you will refer to, I believe it's |
| 01:29 | 7 | Exhibit 12, page 49. We've -- you gave some prior |
| 01:30 | 8 | testimony about that. |
| 01:30 | 9 | A. All right. |
| 01:30 | 10 | Q. Okay. If you will turn to on -- on page 49 -- |
| 01:30 | 11 | A. All right. |
| 01:30 | 12 | Q. -- the third bullet point under "Audit |
| 01:30 | 13 | Procedures," starts with "If the complaint is due to |
| 01:30 | 14 | identity theft." |
| 01:30 | 15 | A. Um-hum. |
| 01:30 | 16 | Q. Read -- can you read that first -- just that |
| 01:30 | 17 | first line. |
| 01:30 | 18 | A. If the complaint is due to identity theft, |
| 01:30 | 19 | reverification will be required on employment. |
| 01:30 | 20 | Q. Okay. Reverification of what? |
| 01:30 | 21 | A. That if there was -- if there was something in |
| 01:30 | 22 | the file that verified the employment such as W-2s, pay |
| 01:30 | 23 | stubs or whatever, we would try to reverify the |
| 01:30 | 24 | information and make sure that none of them had been |
| | 25 | falsified or changed in any way. |

```
01:30  1        Q.   And were those documents associated with the
01:31  2   loan closing in the underwriting process?
01:31  3        A.   Yes.
01:31  4        Q.   Okay.  So what are you looking for
01:31  5   specifically?
01:31  6        A.   When I'm trying to reverify something or...
01:31  7        Q.   Yes.
01:31  8        A.   Is if there is anything that would be unusual
01:31  9   about any of the documents in the file.
01:31 10        Q.   That were required by...
01:31 11        A.   By the original underwriter.
01:31 12        Q.   Okay.  How is that different, if at all, if
01:31 13   the underwriting process doesn't require any of these
01:31 14   enumerated items?
01:31 15        A.   Then we normally would not -- if they didn't
01:31 16   require them to begin with, then there's nothing really
01:31 17   to reverify.
01:31 18        Q.   Okay.  How much, if any, is your job to review
01:31 19   the underwriting guidelines themselves or the
01:31 20   underwriting process?
01:32 21        A.   We don't normally do that because there's so
01:32 22   many different programs and so many different types of
01:32 23   loans that we normally don't get into if the underwriter
01:32 24   wrote to a certain, you know, type of guidelines.
      25   That's -- we -- that's -- we -- we assume that the
```

```
01:32   1    underwriter did their job to begin with.
01:32   2         Q.   And how -- how -- do you know or -- yeah.  Do
01:32   3    you know who establishes the underwriting guidelines?
01:32   4         A.   The different investors -- Fannie Mae, Freddie
01:32   5    Mac -- whatever investor or whatever bank, you know,
01:32   6    holds the mortgage or that they -- they invest in the --
01:32   7    in the mortgage.
01:32   8         Q.   Okay.  But is that part of your job
01:32   9    description to...
01:32  10         A.   No.
01:33  11         Q.   Okay.  Okay.  If you will turn to Exhibit 4,
01:33  12    please.  And, actually, if you could maybe take it out
01:33  13    of the binder, but have Exhibits 1 and 4 in front of you
01:33  14    at the same time.  Here.
01:34  15         A.   Oh, okay.  I lost one somewhere along there.
01:34  16    Okay.
01:34  17         Q.   Okay.  Speaking of Exhibit 4 -- or referring
01:34  18    to Exhibit 4, it's entitled the "Initial Loan Profile."
01:34  19    What is this document?
01:34  20         A.   This was an internal document that is in
01:34  21    our -- was in our old system where we type up our final
01:34  22    findings after we review the loan and do all our
01:34  23    investigation.
01:34  24         Q.   Okay.  And what's the -- this review date
       25    here, what is that on the top right-hand corner?
```

```
01:41   1    letters have been sent out.
01:41   2              You testified earlier you -- you didn't
01:41   3    know what for sure that was about.
01:41   4         A.   Right.
01:41   5         Q.   What, if anything, do you know about the
01:41   6    Pick-A-Pay class action lawsuit?
01:41   7         A.   Just that I've heard about it, but nothing
01:41   8    specific.
01:41   9         Q.   Do you know if Mr. Ernst was negotiating with
01:41  10    Wells Fargo about settlement under the class action
01:41  11    lawsuit?
01:41  12         A.   I don't know that one way or the other.
01:42  13         Q.   Okay.  Okay.  Going back to Exhibit -- Exhibit
01:42  14    4 and Exhibit -- Exhibit 1, you testified just a minute
01:42  15    ago you got this referral and contacted Mr. Ernst
01:42  16    shortly thereafter.
01:42  17         A.   Um-hum.
01:42  18         Q.   What was your -- what was your first point of
01:42  19    contact with him?  Was it an e-mail?  Did you call him?
01:42  20         A.   I called him.
01:42  21         Q.   And what did you -- what did you talk about?
01:42  22         A.   We had a long discussion when I -- when I
01:42  23    pulled up some of the information -- after I looked
01:42  24    through the file, I pulled up a lot of information about
       25    the -- the title chain to the property and information
```

```
01:43  1   about Thomas Ernst, the person that had signed the --
01:43  2   for him as a power of attorney.  So I had a lot of
01:43  3   questions for him about who these people were and, you
01:43  4   know, what happened to the title, did he know anything
01:43  5   about that and so forth.
01:43  6        Q.   What did -- what was his response about the
01:43  7   step -- let me back up.
01:43  8             What did you find relating -- regarding
01:43  9   the title to the property?
01:43 10        A.   I found that shortly after closing that the
01:43 11   title had been transferred to a trust in the name of
01:43 12   Dorothy Valgenti.
01:43 13        Q.   Okay.  What -- what else did you find, or did
01:43 14   you find anything else?
01:43 15        A.   About the property itself?
01:43 16        Q.   Um-hum.  Um-hum.
01:43 17        A.   That's all I can recall.
01:43 18        Q.   And what program or what -- what -- what tools
01:43 19   did you use to do a title search?
01:43 20        A.   There's a -- we have a program that's called
01:44 21   RealQuest that's a vendor, and it will -- it shows all
01:44 22   the title transfers to a property.
01:44 23        Q.   Okay.  What other -- what other -- what's --
01:44 24             Backing up from your conversation with
       25   Mr. Ernst.
```

```
01:44   1              A.   Um-hum.
01:44   2              Q.   You get this referral, what's the first thing
01:44   3       you do?
01:44   4              A.   I take a look at the doc -- the pertinent
01:44   5       documents in the file that are pertinent to his
01:44   6       complaint.
01:44   7              Q.   Okay.  Did you do that in this case?
01:44   8              A.   Yes.
01:44   9              Q.   Okay.  What -- what else, if anything, do you
01:44  10       do?
01:44  11              A.   I pull a new credit report just to see, get an
01:44  12       idea if they bought any other property; what his credit
01:44  13       looks like now.  I ran a -- a person check on Mr. Ernst
01:44  14       on the -- the signer of the -- of the person that was on
01:44  15       the power of attorney to the person who owns the
01:44  16       property now.  I did a person check, which is kind of
01:44  17       like a background check, on all these people to see if I
01:44  18       could figure out who these people were and why they were
01:45  19       involved.
01:45  20              Q.   Did you -- what did the results of those
01:45  21       investigations, if anything, tell you?
01:45  22              A.   Well, the -- they -- a lot of them had the
01:45  23       same addresses, previous addresses or current addresses.
01:45  24       They were all from the same area.  Just they -- they
       25       seem to be relatives because they -- we pulled one that
```

```
01:45   1    has a relative list so it looks like they might be
01:45   2    relatives.  So there were a lot of questions I had after
01:45   3    I -- I pulled all these materials.
01:45   4         Q.   And did you raise any of these questions with
01:45   5    miss -- with Joseph Ernst in your --
01:45   6         A.   Yes, I did.
01:45   7         Q.   And what -- can you just pick one and...
01:45   8         A.   Well, I -- I asked him who Dorothy Valgenti
01:45   9    was, and he said that was his aunt.  And I asked him who
01:45  10    Thomas Ernst was, and he said that was his father.  And
01:45  11    then he explained that he wasn't speaking to his father
01:46  12    and went on to talk about past occurrences that -- that
01:46  13    his father was involved in.
01:46  14         Q.   Okay.  Let's just back, you know, on that --
01:46  15    just take one of each of those in turn.
01:46  16              Dorothy Valgenti, what did he say, if
01:46  17    anything, about Dorothy Valgenti?
01:46  18         A.   Not much, except that that was his aunt.  And
01:46  19    I think -- I can't recall whether he said she was living
01:46  20    on the property or not.  I would have to look at my
01:46  21    notes.
01:46  22         Q.   Did -- did you tell him that you learned the
01:46  23    property was currently titled in a Valgenti Trust?
01:46  24         A.   Yes, I did.
        25         Q.   And what, if anything -- what was his reaction
```

```
01:47  1        A.   I -- I couldn't remember whether he told me
01:47  2   that or I found that out on the person report.  I really
01:47  3   can't recall.
01:47  4        Q.   Okay.  Did he -- did he mention -- or what, if
01:48  5   anything, did he -- did he tell you about his -- his
01:48  6   residence?
01:48  7        A.   That he had only lived in this subject
01:48  8   property that we gave the loan on for three months, I
01:48  9   think, one summer when he -- or when he was in school
01:48 10   for just a short amount of time.
01:48 11        Q.   Okay.  Did he ever mention that he lived there
01:48 12   for between 2007 and 2009?
01:48 13        A.   No.
01:48 14        Q.   This is -- is this the only time you spoke to
01:48 15   him about living at the property?
01:48 16        A.   I think it was.
01:48 17        Q.   Okay.  What -- tell me more about your first
01:48 18   conversation with him.  You -- you discussed the results
01:48 19   of your investigation.
01:48 20        A.   Um-hum.
01:48 21        Q.   What else?  Did he -- did he discuss his
01:48 22   father at all?
01:48 23        A.   Yes.  He went into some detail about his
01:48 24   father that he had -- he had a pattern of purchasing
      25   properties in his children's names and that he did the
```

```
01:49  1   same thing and in I think it was Missouri and Indiana
01:49  2   when they were younger and...
01:49  3        Q.   Did you -- did you attempt to follow up or
01:49  4   what -- what, if anything, did you do to --
01:49  5        A.   I asked him to send me any documents that he
01:49  6   had concerning this, you know, to help his case to show
01:49  7   that, you know, there was a pattern of his father to do;
01:49  8   but I never received any.
01:49  9        Q.   Did you ever -- did you -- how many times did
01:49 10   you -- did you follow up with him?
01:49 11        A.   Gosh, at least three or four times.
01:49 12        Q.   Okay.  You testified earlier that you
01:49 13   contacted Mr. -- or the -- the notary, Pankaj Teli.
01:49 14        A.   Um-hum.
01:49 15        Q.   Do you know when you talked to him?
01:49 16        A.   Before I wrote this report.  Let's see.
01:49 17   Because I -- I -- I remember, you know, writing it in
01:50 18   the report that I had tried to -- that I had contacted
01:50 19   him.
01:50 20        Q.   Like if you look at the last paragraph --
01:50 21        A.   Yeah.  It says on October 6th of 2009.
01:50 22        Q.   So you spoke to the notary October 6th, 2009?
01:50 23        A.   Um-hum.
01:50 24        Q.   How soon was that or what -- when was that in
      25   relation to when you got this referral from Claudette
```

```
01:57  1   restated what I -- the facts that I had already found
01:57  2   out.
01:58  3         Q.   Okay.  Paragraph -- let's see -- my apologies.
01:58  4   I'm trying to find my place.  Paragraph 14 of Exhibit 1,
01:58  5   your declaration.
01:58  6         A.   "I corresponded by e-mail with Mr. Ernst
01:58  7   on" --
01:58  8         Q.   Um-hum.  Okay.  And can you read that last
01:58  9   sentence for me.  Mr. Bennett also asked you about this.
01:58 10         A.   "I reiterated" -- that?
01:58 11         Q.   Yes.
01:58 12         A.   I reiterated to you -- Mr. Ernst contacting
01:58 13   this -- that -- that this contacting the notary would be
01:58 14   the first step in attempting to prove -- to prove that
01:58 15   he did not sign the power of attorney.
01:58 16         Q.   And Mr. Bennett wanted to know if those were
01:58 17   my words or your words.
01:59 18         A.   Oh, that -- those were my words.  I -- I -- I
01:59 19   put that in an e-mail to him.
01:59 20         Q.   Can you look at the last sentence of Exhibit
01:59 21   4, please, and just read that for me.
01:59 22         A.   It was reiterated that it would be the first
01:59 23   step in attempting to prove that he did not sign the
01:59 24   power of attorney.
      25         Q.   Okay.  I just have a few more questions.
```

```
02:02  1         Q.   How cooperative, if at all -- or how would you
02:02  2    describe your typical consumer complaint and the
02:02  3    behavior of the person making the complaint?
02:02  4         A.   That if -- if they truly feel that the --
02:02  5    there's something in the file that -- that they did not
02:02  6    sign, they will -- they will do their part to help in
02:02  7    the investigation.  There's only so much that -- that we
02:02  8    can do.  We can -- you know, if they have any idea who
02:02  9    maybe did it or that, you know, try to contact people.
02:03 10    Like the lady that I was talking about contacted the
02:03 11    secretary of state.  They went over the documents that
02:03 12    the notary had.  There were a lot of things behind the
02:03 13    scenes that -- that she -- she cooperated with.
02:03 14         Q.   Is that the only example of that?
02:03 15         A.   No.  I can't think of any right now, but we do
02:03 16    ask -- like I said, we do ask everybody to file a police
02:03 17    report because once you go to the police and you have
02:03 18    to -- you have to give details of what happened and how
02:03 19    you -- how you think it happened and who the people
02:03 20    involved were.  And we're just a third party in that.
02:03 21    It's not up to us to -- to file a police report.
02:03 22         Q.   I wanted to ask you -- I just have one more
02:03 23    question -- two more questions.
02:03 24              I think you answered yes -- and -- and
       25    if -- if I'm wrong about this, then I'll withdraw this
```

```
02:03  1   question.  But Mr. Bennett asked you, you had already
02:04  2   determined this was not a fraud by the time you
02:04  3   contacted the notary.  And that would have been
02:04  4   October -- I don't have it in front of me -- October...
02:04  5        A.    October 6th --
02:04  6        Q.    Okay.
02:04  7        A.    -- I spoke to the notary.
02:04  8        Q.    Is that accurate?  Had you already determined
02:04  9   that this -- this was --
02:04 10        A.    Was not a fraud?
02:04 11        Q.    Was not a fraud.  I think that's what he said.
02:04 12   I might be wrong.
02:04 13        A.    No.  I had no determination of that.  I mean,
02:04 14   there's always suspicions, but I had not determined one
02:04 15   way or the other when I spoke with the notary.
02:04 16        Q.    Okay. And did your investigation that -- your
02:04 17   report, does that -- does that -- let me rephrase.
02:04 18   Strike that.
02:04 19              Would you characterize your report as --
02:05 20   no.  Strike that.
02:05 21              Last question:  You testified --
02:05 22   Mr. Bennett asked you some questions about the accent
02:05 23   of the notary.
02:05 24        A.    Um-hum.
      25        Q.    Do you believe you understood what he was
```